## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PLASTICS NYC, LLC, | ) | Case No. 1:23-cv-02291 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Reuben J. Sheperd |
| | ) | |
| PLASTICS BOUTIQUE, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

In this trademark infringement action, competing clothing companies use the phrase "The Plastics" in the design, marketing, and promotion of their product lines. Each claims intellectual property rights in that mark.  Defendants moved for a preliminary injunction in response to actions Plaintiff took to de-platform them from certain social medial channels that Defendants use to access the market.  On August 16, 2024, the Court held a preliminary injunction hearing.

## FINDINGS OF FACT

Based on the record and evidence adduced at the hearing on the motion for preliminary injunction, the Court makes the following findings of fact for purposes of Defendants' motion for a preliminary injunction.

### A.    The Parties

### A.1    Plaintiff Plastics NYC, LLC

Plaintiff Plastics NYC, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.  Jayvon Johnson incorporated

Plastics NYC on June 1, 2020.  Plastics NYC is an online clothing retailer of "high street fashion" for men and women, and its products include shirts, pants, jackets, shorts, hooded sweatshirts, sweatshirts, body suits, and dresses.  Plastics NYC sells high-end, high-quality clothing ranging in price from $40 to $300 or more.  In connection with its products and marketing efforts, Plastics NYC uses the mark "The Plastics."  Mr. Johnson developed the brand to pay homage to his friends in the fashion industry but otherwise said little in his testimony about the origin of his use of the mark in his business, even in response to the Court's question.

In the complaint, Plaintiff claims to have used "Plastics" phrasing on a t-shirt as early as July 24, 2016.  (ECF No. 1, ¶ 16, PageID #4.)  When choosing the name "Plastics," Mr. Johnson claims that he did little research to see whether other retailers sold "Plastics"-branded products.  He searched on Instagram only and did not perform a general internet search.  Plastics NYC utilizes social media and its online retail website, www.theplasticsnyc.com, to sell its products.  Plaintiff's website became active on July 1, 2020 or shortly before.  Until then, Plastics NYC sold its merchandise through word of mouth.  Its social media accounts have amassed approximately 9,200 followers, and Plastics NYC has generated some $214,000 in revenue over eight years, an average of under $30,000 per year.

### A.2.   Defendant Plastics Boutique, LLC

Defendant Plastics Boutique, LLC is an Ohio business incorporated in January 2019.  Defendant Angel Adams owns Plastics Boutique and is "responsible for [its] development, design, production, sales, marketing, advertising, and product promotion."  (ECF No. 19-4, PageID #292; ECF No. 19-1, ¶¶ 3–4, PageID #234.)

Ms. Adams began developing the idea for her brand as early as 2017.  (Exh. 2.) Plastics Boutique sells "modern, urban fashion for women, which includes varsity jackets, bomber jackets, loungewear, jogging suits, robes, hats, and duffle bags" for women ages eighteen to twenty-seven.  (ECF No. 19-1, ¶ 5, PageID #234.)  Plastics Boutique markets and advertises its products on its website, www.plasticsbrand.com and through social media platforms such as Instagram, Facebook, and TikTok. Plastics Boutique's clothing ranges in price from $35–$195.  Its most expensive item costs $250.

Generally, the record demonstrates that growing a social media presence takes time and resources.  Social media advertisement and promotion is the "primary method" Plastics Boutique uses to engage with its customers and is "critical" to the business's survival.  (ECF No. 19-1, ¶ 16, PageID #235; *see also* Exh. 10 (identifying Instagram as the top source of website traffic).)  Plastics Boutique's social media accounts have amassed over 100,000 followers.  (*Id.*, ¶ 18, PageID #236.)  Ms. Adams invested substantial time and money into influencer marketing and promotional videos to develop this audience and grow her company's customer base.  In total, she put between $150,00 and $200,000 into marketing efforts over the last two years, and sales generally increased as a result, making Plastics Boutique a successful and profitable business (*see* Exh. 9).

Plastics Boutique started using the terms "Plastics" and "Plastics Boutique" on t-shirts marketed and sold in January 2019.  (Exh. 5; Exh. 6; *see also* ECF No. 19-1, ¶ 8, PageID #235.)  Plastics Boutique's use of "Plastics" and "The Plastics" refers to

the 2004 hit movie, Mean Girls.  Before establishing the business, Ms. Adams did some due diligence and found only one other clothing retailer in Ohio that used "Plastics" in their designs.  Plastics Boutique's first use of the term "Plastics" was on an online advertisement that appeared on January 28, 2019.

In early 2021, Plastics Boutique designed and released a bomber jacket inspired by the famous Beatles logo, with the phrase "The Plastics" displayed on the back.  (ECF No. 19-1, PageID #242; ECF No. 1, ¶ 23, PageID #5 (photograph of the allegedly infringing jacket).)  This jacket was sold around November 5, 2021.  (ECF No. 19-4, PageID #291.)  Plastics Boutique maintains that jackets are the only category of clothing it sells with the complete phrase "The Plastics."  (ECF No. 19, PageID #220 (citing www.plasticsbrand.com).)

Ms. Adams testified that no one has ever contacted her expressing confusion between Plastics Boutique and Plastics NYC.  For his part, Mr. Johnson testified that one person asked him whether Plastics NYC sells varsity jackets—a mainstay product of Plastics Boutique.

## B.    "The Plastics" Trademark Registration and Amendment

From November 26, 2013 to June 3, 2020, Yvonne Nicoletti, who is not a party to this action, owned "The Plastics" trademark registered under the USPTO registration number 4439914.  (ECF No. 19-2, PageID #271–72.)  On this trademark application, Nicoletti indicated that the mark was first used anywhere at least as early as January 1, 2009 and first used in commerce at least as early as January 15, 2009.  (*Id.*, PageID #277.)

4

On March 29, 2022, Mr. Johnson applied for a trademark for the phrase "The Plastics" to be used on dresses, hats, pants, shirts, shorts, skirts, tops as clothing, sweatshirts, and t-shirts.  (Exh. 17; ECF No. 19-2, PageID #248–49.)  On this application, Mr. Johnson indicated that the first use of the phrase anywhere was at least as early as July 1, 2020 and that the first use of the phrase in commerce was at least as early as July 1, 2020.  (Exh. 17; ECF No. 19-2, PageID #249.)  Mr. Johnson is not associated or affiliated with Nicoletti in any way, and she did not "assign, license, or otherwise convey a legal right to use the mark 'The Plastics'" to him.  (ECF No. 19-3, PageID #282.)

At the hearing, Mr. Johnson testified that he was aware of Plastics Boutique and its products before registering his trademark.  The record supports a finding that his knowledge of Plastics Boutique's products, brand, and social media following prompted him to pursue a trademark application.  Additionally, Mr. Johnson admits that the phrase "The Plastics" was used in the Mean Girls movie "to refer to a group of popular girls" and "the word 'Plastics' and the phrase 'The Plastics' are used in numerous other registered trademarks in various classifications."  (*Id.*, PageID #284.)  On May 16, 2023, the USPTO issued the trademark under registration number 7053111.  (ECF No. 1, ¶ 13, PageID #3; *id.*, PageID #19.)

### C.    Cease-and-Desist Letter

On September 7, 2023, Plaintiff Plastics NYC sent a cease-and-desist letter to Defendant Plastics Boutique, advising that it owned a trademark for the phrase "The Plastics" that it first used "on July 1, 2020."  (Exh. 16.)  On October 5, 2023, Ms. Adams informed Plastics NYC that she believed she used the mark first.  (ECF

No. 19-1, ¶ 20, PageID #236; *id.*, PageID #242.)  This contact was the first time Ms. Adams heard of Plastics NYC or Mr. Johnson.  The record contains no evidence that Plastics NYC has sent other cease-and-desist letters to any person or entity.

On September 27, 2023, Plastics NYC requested a voluntary amendment to its trademark registration to change the date of first use of the mark anywhere to January 1, 2018.  (Exh. 18; ECF No. 19-2, PageID #257.)  Mr. Johnson filed that trademark application without the help of an attorney and claims that he misunderstood the meaning of "first use" and "first use in commerce" on the application.  (Exh. 17; ECF No. 19-2, PageID #257.)

Initially, the USPTO did not accept the request for amendment because it did not contain an affidavit or declaration explaining how the error occurred.  (ECF No. 19-2, PageID #262.)  Subsequently, Mr. Johnson submitted an affidavit to support the correction, representing that he first used the mark in commerce on July 24, 2016.  (Exh. 19; ECF No. 19-2, PageID #268.)  The complaint includes a photo purporting to be from Mr. Johnson's personal Instagram account of him wearing a shirt with "Plastics" phrasing dated July 16, 2016.  (ECF No. 1, ¶ 16, PageID #4.)  At the hearing, however, Mr. Johnson did not present this photo as evidence, provided no other evidence or testimony about it, and did not authenticate it or present other evidence of its reliability.  Further, he failed to substantiate his claim that he designed and sold "Plastics"-branded products as early as 2016.  Nor was he able to explain the discrepancy in the dates on the USPTO filings in response to questions from the Court.

On July 30, 2024, the USPTO issued an updated registration setting the first use of the trademark anywhere as July 24, 2016 and the first use of the trademark in commerce as July 1, 2020.  (Exh. 20; ECF No. 19-2, PageID #269.)  The trademark registration's applicable class of goods includes dresses, hats, pants, shirts, shorts, skirts, tops as clothing, sweatshirts, and t-shirts.  (*Id.*)

### D.    Plastics NYC's Self-Help Measures

In November 2023, Mr. Johnson reported many of Plastics Boutique's Instagram posts, alleging that the posts infringed on his trademark rights.  (Exh. 13; ECF No. 19-1, ¶ 21, PageID #236; ECF No. 23, PageID #313.)  It did so when Mr. Johnson learned that Plastics Boutique sold a flower "Plastics" bomber jacket that he felt came too close to flower push shorts that Plastics NYC sells. Instagram removed the posts from Plastics Boutique's page and suspended the account "for a period of time."  (ECF No. 19-1, ¶ 21, PageID #236.)  Ms. Adams testified that Instagram reinstated the profile later that day, but the individual posts did not reappear automatically.

Ms. Adams maintains that Mr. Johnson's activities "coincided with the launch of a new collection of clothing."  (*Id.*, ¶ 23.)  Plastics Boutique relies on new collection launch days because they "generate significantly increased online traffic and sales." (*Id.*, ¶ 24.)  Without the ability to advertise the launch on social media, Plastics Boutique suffered an "immediate loss of sales and revenue" and "reputational damage and a loss of goodwill."  (Exh. 9; ECF No. 19-1, ¶ 25, PageID #237.)  Since these reports, Ms. Adams also noticed decreased engagement on Plastics Boutique's social media accounts.  (Exh. 10; ECF No. 19-1, ¶ 27, PageID #237.)

On November 4, 2023, Mr. Johnson reported Plastics Boutique's TikTok account for the same reasons.  (Exh. 14; ECF No. 19-1, ¶ 28, PageID #237.)  TikTok suspended Plastic Boutique's account in March 2024.  (ECF No. 19-1, ¶ 29, PageID #237.)  Ms. Adams then created a new TikTok account for Plastics Boutique.  (*Id.*, ¶ 30.)  On August 1, 2024, Mr. Johnson reported the new TikTok account for trademark infringement.  (*Id.*, ¶ 31; *id.*, PageID #243; ECF No. 23, PageID #313.)  TikTok suspended Plastics Boutique's second account.  (ECF No. 19-1, PageID #244.)

Plastics NYC explains these actions by saying that it has "gone directly to the marketplace" and "utilized avenues provided by social media platforms to prevent damage to . . . its brand."  (ECF No. 23, PageID #313.)  Plastics NYC claims that it "has suffered and continues to suffer significant ongoing harm to its brand and reputation" because of Plastic Boutique's alleged trademark infringement.  (*Id.*)

### E.    Credibility Determination

For the purposes of the preliminary injunction motion only, the Court finds that Mr. Johnson's testimony at the hearing was not credible.  This determination is based largely on the Court's observation of Mr. Johnson and his demeanor on the witness stand, including his unclear and conflicting answers to questions and inability to recall important dates.

In all, the record supports findings that Mr. Johnson applied for a trademark *after* learning of the Plastics Boutique's business and its success.  After sending a cease-and-desist letter to Ms. Adams, Mr. Johnson tried to amend his trademark registration to change the dates for his first use anywhere and first use in commerce to make them earlier.  This amendment was an affirmative and knowing effort to

change the facts to help strengthen his claims. Mr. Johnson's inability to explain these different dates and other material facts (such as providing a clear origin story for his brand) and his failure to present evidence other than his own testimony, which was not credible, that he sold "Plastics"-branded merchandise as early as 2016 support these findings.

Additionally, the record demonstrates that Mr. Johnson has exerted minimal effort to protect his intellectual property rights. Before starting Plastics NYC, he testified that he searched only on Instagram for other brands selling "Plastics"- and "The Plastics"-branded clothing and had not searched the internet more broadly. As demonstrated at the hearing, however, a simple Google search at the time reveals many examples of other retailers selling clothing bearing the phrases "Plastics" and "The Plastics" at different retailers and at all different price points. (*See* Exh. 11.) Instead of pursuing claims against any of these sellers, Plaintiff targeted Plastics Boutique and Ms. Adams.

For these reasons, the Court finds that Mr. Johnson cannot be trusted accurately to state the operative facts necessary for resolving Defendants' motion for a preliminary injunction, and the Court discounts his version of them substantially in the analysis.

## STATEMENT OF THE CASE

On November 28, 2023, Plastics NYC sued Plastics Boutique for trademark infringement. (*See generally* ECF No. 1.) Neither Plastics NYC nor Mr. Johnson have pursued trademark claims against any other retailer selling "Plastics"- or "The

Plastics"-branded merchandise.  Plaintiff asserts various federal causes of action and one common-law claim:  (1) trademark infringement, 15 U.S.C. § 1114; (2) unfair competition, 15 U.S.C. § 1125(a); (3) dilution of trademark, 15 U.S.C. § 1125(c); (4) unfair and deceptive trade practices, 15 U.S.C. § 45(a); (5) common-law trademark infringement and unfair competition.  (*See generally id.*)  On April 29, 2024, Defendant answered and brought the following counterclaims:  (1) a request for a declaratory judgment that Plaintiff's trademark is invalid and unenforceable or, in the alternative, that Defendant's use of the terms "Plastics" or "The Plastics" does not constitute infringement; (2) a claim for tortious interference with business relationships; and (3) a claim for unfair competition.  (*See generally* ECF No. 15.)

On August 8, 2024, Defendants moved for a preliminary injunction and expedited hearing, seeking (1) to enjoin Plaintiff and its authorized agents, "from directly or indirectly interfering or attempting to interfere with [Defendants'] relationships with social media platforms and its social media accounts" and (2) for the Court to order non-party social media sites to reinstate Defendants' accounts. (ECF No. 19, PageID #214.)  Plaintiff opposes a preliminary injunction and argues that by reporting Defendants' social media accounts it is "enforcing his rights under trademark law" and that it is "doing everything in its power to mitigate the damage that has been caused . . . to its brand through Defendants' actions."  (ECF No. 23, PageID #307.)

Plaintiff has not formally moved for a preliminary injunction.  But in its opposition to Defendants' motion, Plaintiff requests that the Court deny Defendants'

request for a preliminary injunction and "enjoin[] Defendants and its authorized agents from posting clothing with 'The Plastics' and 'Plastics' to social media platforms to prevent on-going harm." (*Id.*, PageID #313 & 319.)

On August 16, 2024, the Court held an evidentiary hearing on Defendants' motion.  (ECF No. 24.)  The Court advised Plaintiff that since it did not have a pending motion for preliminary injunction, it would not consider its informal request for a preliminary injunction made in its brief opposing Defendants' motion seeking a preliminary injunction.

## ANALYSIS

When a party seeks a preliminary injunction, a district court balances the following factors:  (1) the movant's likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without an injunction; (3) whether the injunction would cause "substantial harm" to others; and (4) whether the public interest is served.  *See Wilson v. Williams*, 961 F.3d 829, 836 (6th Cir. 2020); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  As the movants, Defendants bear "the burden of justifying such relief."  *Wilson*, 961 F.3d at 837 (*citing American Civ. Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015)).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  While the movant need not proffer "irrefutable proof" or "prove his case in full at a preliminary injunction hearing" to merit his

11

requested relief, *In Re DeLorean Motor Co.*, 755 F.2d 1223, 1230 (6th Cir. 1985), the movant still must furnish sufficient evidence to make a "clear showing" that the balance of factors favors the issuance of a preliminary injunction. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020).

## I.    Likelihood of Success on the Merits

"The likelihood of success on the merits is typically the most important factor of a preliminary injunction analysis." *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024) (citing *Sunless, Inc. v. Palm Beach Tan, Inc.*, 33 F.4th 866, 871 (6th Cir. 2022)).   As the movant, Defendants need not demonstrate a likelihood of success on the merits of every claim; Defendants need only "show a likelihood of success on the merits of at least one of [its] claims." *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019); *see also Transtex Composite, Inc. v. Laydon Composite, Ltd.*, No. 12–150–C, 2012 WL 5362191, at *2 (W.D. Ky. Oct. 30, 2022).   Defendants move for a preliminary injunction only on its declaratory judgment counterclaim, seeking a declaration that "Plaintiff's trademark(s) is/are invalid, have not been infringed by Defendants, and are unenforceable."   (ECF No. 15, ¶ 23, PageID #190.)   Plaintiff opposes Defendants' motion by offering its own trademark analysis.   In short, the parties agree that the likelihood of success turns on the likelihood that Plaintiff's mark is valid.

To succeed on the merits of a trademark infringement claim, Plaintiff must prove:   (1) it owns the registered trademark; (2) Defendants used the mark in commerce without authorization; and (3) Defendants' use was likely to cause confusion among consumers regarding the origin of the goods offered by the parties.

12

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).  Here, the dispute is limited to the second and third elements:  whether Defendants' purported "senior use" of the trademark trumps Plaintiff's trademark claims as a matter of law and whether Defendants' use of the mark causes confusion in the marketplace.   And in the current procedural posture, Defendants bear the burden of proof.

### I.A.    First Use of the Mark in Commerce

"Rights in a trademark are determined by the date of the mark's first use in commerce."  *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015).  Accordingly, trademark "ownership is not acquired by federal or state registration.   Rather, ownership rights flow only from prior appropriation and actual use in the market." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991).  While federal registration of a trademark grants nationwide priority as of the filing date of an application for registration, 15 U.S.C. § 1057(c), the registrant's rights "are always subject to any superior common law rights acquired by" the senior user of a mark.   *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001); *see also* 15 U.S.C. § 1057(c).  The first to use a mark in commerce is the "senior user" and obtains common-law ownership in the geographic area where the mark is used—even if the use of the mark is not extensive and does not result in widespread recognition.  *Allard Enters.*, 249 F.3d at 572.

In this case, the parties dispute who used the "The Plastics" trademark in commerce first.  Mr. Johnson registered Plastics NYC as an LLC on July 1, 2020, created his website on July 1, 2020, and applied for the trademark on March 29, 2022. To help his position in this lawsuit, Mr. Johnson sought to amend the trademark

registration to change the date of its first use in commerce. Even then, he had to make two efforts to change that date to push it back to 2016, a date which would help his claims if it were true. But he presented no evidence to support his use of the mark as early as 2016. For this reason, and based on the credibility finding above, the Court disregards the amended USPTO registration as procured in aid of position taken for litigation purposes. Even then, the amended USPTO registration indicates that the first use of the mark in commerce was July 1, 2020. Plaintiff offered no evidence to support his claims that he began using "Plastics" and "The Plastics" *in commerce* in 2016.

For Defendants' part, Ms. Adams formed Plastics Boutique on January 18, 2019, and began advertising and marketing its products with the word "Plastics" around January 28, 2019. Ms. Adams testified that she began developing her "Plastics" brand as early as 2017 (Exh. 2) and that Plastics Boutique started selling products bearing "Plastics" phrasing in 2019 (Exh. 5; Exh. 6; *see also* ECF No. 19-1, ¶¶ 8–9, PageID #235).

Accordingly, Defendants have carried their burden of showing by clear evidence that they began using the "Plastics" phrasing in 2019. In contrast, Plaintiff's use dates to around July 1, 2020. Therefore, the record shows that Defendants are likely to succeed on their claim that they are the "senior user" of the mark in commerce and that they retain common-law rights to use "Plastics" and "The Plastics" on Plastics Boutique merchandise. *See Allard Enters.*, 146 F.3d at 572.

### I.B.    Likelihood of Confusion

Even if Defendants are not the "senior user" of the mark, Defendants are likely to succeed on their declaratory judgment action because Plaintiff's trademark claims are weak, and Defendants have shown as much.  "The touchstone of liability" for a Lanham Act trademark infringement case is whether the allegedly infringing use of the mark—in this case, Defendants' use of "The Plastics"—"is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).  When determining whether a likelihood of confusion exists, the Court must examine and weigh the following factors:  (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) likely degree of purchaser care; (7) the intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines.  *Id.*  Defendants focus their arguments on factors (1), (2), (4), (5), and (6) and Plaintiff offers no additional evidence or discussion on the other factors.

Any disputes about the evidence that pertains to the eight factors represents a fact question.  *Therma-Scan Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630–31 (6th Cir. 2002).  But balancing the factual findings to determine the ultimate issue of likelihood of confusion is a question of law for the Court.  *Id.*

### I.B.1. Strength of Plaintiff's Mark

This factor "focuses on the distinctiveness of a mark and its recognition among the public.  *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416,

427 (6th Cir. 2017) (quotation omitted).  A mark's strength is comprised of two components:  conceptual and commercial strength.  *Id.*

To determine conceptual strength, courts classify trademarks into categories of increasing distinctiveness.  *Daddy's Junky Music Stores*, 109 F.3d at 280.  The more distinct a mark, the more likely confusion will result from its infringement, which necessitates more protection.  *Id.*  Plaintiff contends that the "The Plastics" mark falls into the "arbitrary" category.  (ECF No. 23, PageID #316.)  An arbitrary mark represents "the far extreme on 'a spectrum of increasing strength' among the categories."  *Therma*-Scan, 295 F.3d at 631.  "An arbitrary mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers."  *Daddy's Junky Music Stores*, 109 F.3d at 281.

Neither party disputes that the phrases "The Plastics" and "Plastics," "although consisting of words with recognized meaning in everyday speech, do not have an inherent connection with the sale of [clothing]."  *Daddy's Junky Music*, 109 F.3d at 281.  Accordingly, "The Plastics" likely is an arbitrary mark.

Even an arbitrary mark, however, may still be weak.  An arbitrary mark is not strong unless it achieves "broad public recognition across product lines."  *Therma*-*Scan*, 295 F.3d at 631.  Additionally, "[t]hird-party use weakens a mark because the mark is not an identifier for a single source."  *Progressive Distrib. Servs.*, 856 F.3d at 429–30; *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009) (describing a trademark registrant operating in a "crowded field" of other

related marks on similar products as having a "relatively weak [position] in its ability to prevent use by others in the crowd").

Defendants emphasize, and Plaintiff concedes, that "The Plastics" mark is used "in numerous other registered trademarks in various classifications." (ECF No. 19-3, PageID #284.)  The record is replete with other examples of clothing retailers selling merchandise with "The Plastics" and "Plastics" phrasing. (Exh. 11.)  Because Plaintiff's trademark operates in a "crowded field," it is not a conceptually strong mark.

Commercial strength of a trademark depends on the mark's recognition in the marketplace.  A trademark holder may demonstrate marketplace recognition through its advertising efforts, marketing reach, and revenue.  *Kibler v. Hall*, 843 F.3d 1068, 1074–76 (6th Cir. 2016).  By these measure, Plaintiff's mark could scarcely be weaker.  Mr. Johnson testified to minimal marketing efforts and expenditures, which reach relatively few consumers, generating low revenues.  And Plastics NYC presented no evidence that its trademark is widely associated with its brand and clothing.

Plaintiff provides no evidence that the general public would associate "Plastics" or "The Plastics" with its clothing brand, as opposed to the Mean Girls movie, Defendants' brand, or any other company.  Plastics Boutique has a more significant social media presence, spends more on marketing each year, and has generated more revenue than Plastics NYC.  Based on this record, the Court concludes that between these two companies, brand recognition lies with Plastics Boutique.

Plaintiff's mark is conceptually weak. Multiple other clothing retailers use "Plastics" and "The Plastics" phrasing, and it is commercially weak because there is no evidence that consumers associate that phrasing with Plastics NYC.

### I.B.2. Relatedness of the Goods or Services

"The relatedness inquiry focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead customers to believe that they 'come from the same source, or are somehow connected with or sponsored by a common company.'" *Therma-Scan*, 295 F.3d at 633 (citing *Homeowners Grp., Inc. v. Home Marketing Specialists, Inc.*, 931 F.3d 1100, 1109 (6th Cir. 1991)). Accordingly, just because there might be some overlap between the products, "it does not follow that the companies compete directly for the same base of customers." *Progressive Distrib.*, 856 F.3d at 342.

Although Plastics Boutique and Plastics NYC both use the phrases "Plastics" and "The Plastics" in their designs, the brands sell different types of clothing to different groups of consumers. Plastics NYC sells high-quality, high-end streetwear for men and women—its designs include bralettes, shorts, button-up shirts, and form-fitting t-shirts. Plastics Boutique exclusively sells women's loungewear, varsity jackets, and accessories. These businesses serve different consumers and offer clothing at different price points. On that scale, Planitiff's products are more expensive and appear to have higher quality.

Although the goods exist in the same broad industry, the clothing each brand offers is not so related as to cause confusion. In short, the types of clothing are different, offered at different price points, and marketed to different groups of

consumers. These goods are not related within the meaning of this factor. *Homeowners Grp.*, 931 F.2d at 1109 (explaining that companies that "operate at different levels in the broad real estate industry and sell to two completely distinct sets of buyers" are not similar, even though their services are not "totally unrelated").

### I.B.3. Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 284. Because such evidence is often hard to find, this factor "is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Id.* (quotation omitted). Isolated instances of actual confusion "after a significant time or a significant degree of concurrent sales under the respective marks," however, may indicate that no likelihood of confusion exists. *Homeowners Grp.*, 934 F.2d at 1110.

Ms. Adams testified that no one had ever contacted her expressing confusion about the difference between Plastics Boutique and Plastics NYC. Plaintiff offers no credible evidence or testimony about any instances of confusion between the two brands. Mr. Johnson's isolated encounter with a single person who asked whether Defendants' varsity jackets were related to his brand—if it even happened—does not present the sort of "chronic mistakes and serious confusion of actual consumers" relevant to this analysis. *Id.* at 1110. The absence of any evidence of actual confusion, despite the coexistence of the brands since 2020, supports the determination that consumers are not confused about whether Plastics NYC is affiliated with Plastics Boutique.

19

### I.B.4. Marketing Channels Used

This factor examines the parties' marketing approaches, which consist of "how and to whom the respective goods or services of the parties are sold." *Therma-Scan*, 295 F.3d at 363 (quoting *Homeowners Grp.*, 931 F.3d at 1110).  Concerning online marketing, courts ask whether "the parties use the internet as a substantial marketing channel, whether the parties use their marks with web-based products, and whether the parties' marketing channels overlap in any other way." *Id.* at 367. (cleaned up).

Defendants concede that both brands use the same internet marketing channels and methods, including social media—contracting with influencers and celebrities to wear and post the clothes online—and retail websites.  This record indicates, however, that Plaintiff's marketing budget and scope is about 10% of Plastics Boutique's.  Moreover, given the difference in the type and quality of clothing for sale and the different types of consumers being marketed and sold to, the record weighs against concluding that any confusion between the two brands is based on their similar marketing channels.  Therefore, this factor does not weigh in favor of either party in determining likelihood of confusion.

### I.B.6. Likely Degree of Purchaser Care

In assessing the degree of purchaser care, courts use a "typical buyer exercising ordinary caution" standard, where more sophisticated buyers buying more expensive products will have a higher standard of care—decreasing the likelihood of confusion. *Daddy's Junky Music Stores*, 109 F.3d at 285.  Courts have found that clothing purchasers generally exercise a high degree of care.  *See Jordache Enters., Inc. v.*

*Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987); *One Indus.*, 578 F.3d at 1165 n.4; *Kookai, S.A. v. Shabo*, 950 F. Supp. 605, 609 (S.D.N.Y. 1997).

Defendants argue that the "purchase of clothing items is a highly personal choice and customer loyalty to brands and interests" means that "ordinary consumers are unlikely to confuse the respective clothing lines." (ECF No. 19, PageID #228.)  In opposition, Plaintiff largely copies a sentence of Defendants' brief, deleting the word "not," and states that "[g]iven the nature of the parties' products—modern fashion, the level of purchaser care is such that it has caused confusion and likely will cause confusion." (ECF No. 23, PageID #317–18.)  Plaintiff does not engage with this argument any further or provide evidence explaining why purchasers of "modern fashion" lack a high degree of care in choosing the products they purchase.

Without question, purchasers of clothing today have many online retailers from which to choose.  A review of the prices of items on each brand's website demonstrates that Plastics NYC sells more expensive clothing than Plastics Boutique.  Plaintiff describes its "high-end" clothing as having a "reputation for quality" involving "more craftsmanship and creativity" (ECF No. 23, PageID #308 & 317; ECF No. 1, ¶ 27, PageID #6)—indicating that its customers are likely more sophisticated than an average consumer and able to discern the difference between the two brands.  This is especially true if, in Plaintiff's words, Defendants' brand consists of "mass produced," "unbranded drop-ship merchandise." (ECF No. 23, PageID #311 & 317.)

Because customers of both brands are likely to exercise a high degree of care when purchasing items, there is a lower likelihood of confusion.  *See Alwear, Inc. v. Mast-Jagermeister US, Inc.*, No. 2:12-cv-00936, 2021 WL 364109, at *7 (D. Utah Feb. 3, 2021) (noting that because customers choose to buy the plaintiff's high-quality clothing products, they likely exercise a high degree of care when purchasing the products).

\*      \*      \*

Considering each of these factors, the record before the Court fails to establish a likelihood of confusion between Plastics NYC and Plastics Boutique.  Plaintiff's mark is weak, the clothing items both brands offer are of different kinds and qualities and sold at materially different price points, there is no evidence in the record of actual confusion, and purchasers of the products these businesses sell likely exercise a high degree of purchaser care in making purchases.  While the parties use similar marketing channels and strategies, Defendants' audience and budget make it unlikely that this fact would result in consumer confusion.  Accordingly, Defendants have carried their burden of proof.  The record clearly shows that Defendants are likely to prevail on their declaratory judgment claim and show that their use of "Plastics" and "The Plastics" phrasing on its merchandise does not constitute infringement.

## II.    Irreparable Harm

Defendants bear the burden of establishing that, in the absence of an injunction barring Plaintiff from interfering with Plastics Boutique's business and social media accounts, they will suffer "actual and imminent" harm, not just harm

that is speculative or unsubstantiated.  *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  A showing of some irreparable injury "is the *sine qua non* for issuance of an injunction."  *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) (citing *Friendship Materials*, 679 F.2d at 105).  Absent an irreparable injury, "there's no need to grant relief now as opposed to at the end of the lawsuit."  *D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).  "[A]lthough the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."  *Id*.

Harm is irreparable where money damages do not fully compensate for the injury.  *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)).  Usually, money does not fully compensate a party where the nature of the loss makes damages difficult to calculate.  *Id.* (citations omitted).

Traditionally, where parties seek injunctions in trademark infringement cases, if the trademark's holder can prove a likelihood of success on the merits of their claim (that is, that the defendant infringed on their trademark or there is a strong likelihood of confusion), a "rebuttable presumption of irreparable harm" exists in the context of resolving a motion for preliminary injunction.  15 U.S.C. § 1116(a).  In a trademark case, "irreparable injury flows both from the potential difficulty of proof of plaintiff's damages and also from the impairment of intangible values."  *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) (quotations omitted).

Here, the procedural posture removes this case from the heartland of typical trademark cases involving requests for a preliminary injunction.  Defendants are not seeking to prevent Plaintiff from selling merchandise with "Plastics" or "The Plastics" branding.  Defendants seek merely to restore the status quo (before Mr. Johnson took matters into his own hands):  that they have full unrestricted access to their social media accounts to market and sell their products.  Defendants argue that Plaintiff's actions have affected Plastics Boutique's "reputation and goodwill" despite knowing that "social media engagement" is the "primary means by which [it] communicates with the buying public."  (ECF No. 19, PageID #229.)   Ignoring Defendants' arguments on this point, Plaintiff instead claims that it will be irreparably harmed by Plastic Boutique's continued social media advertising because of Defendants' trademark infringement.  (*See* ECF No. 23, PageID #318.)

The loss of customer goodwill is a prime example of intangible, irreparable harm.  *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992).  In this case, loss of goodwill would be substantial.  A disproportionate amount of Defendants' sales and exposure occur through social media marketing.  (Exh. 9.)  And social media is the primary marketing tool Defendants use.  Ms. Adams dedicated substantial time, money, and effort building Plastics Boutique's customer base and social media presence.  The record demonstrates that an inability to reach and interact with these customers would result in decreased engagement and consumer support that will be extremely difficult to regain or to liquidate in the form of money damages if Defendants ultimately prevail, as they have shown is likely.

24

Accordingly, an injunction will prevent further loss of customer goodwill, minimize the adverse effects on Plastics Boutique's reputation for which Defendants will likely not receive compensation if they prevail, and restore the status quo while the validity of the mark and the extent of Defendants' alleged infringement is litigated.

## III.  Substantial Harm to Others

Defendants argue that because there is no evidence of confusion, Plaintiff will suffer no harm from an injunction ending its interference with Plastics Boutique's social media presence.  Further, without evidence of confusion, "no third party would be harmed by an injunction that maintains the status quo."  (ECF No. 19, PageID #230.)  Plaintiff argues that it will suffer harm because confusion between the brands will continue, and third-party advertisers will suffer harm because they "may be wrongfully associated with Defendants."  (ECF No. 23, PageID #318.)

In a trademark case where the plaintiff seeks a preliminary injunction, the fear is that third parties will be harmed absent an injunction because they will be confused by a defendant's unauthorized use of a plaintiff's mark.  *See Lopes v. Int'l Rubber Distribs., Inc.*, 309 F. Supp. 2d 972, 983–84 (N.D. Ohio 2004) (citing *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 328 (6th Cir. 1973)).  But the record presents no credible evidence demonstrating confusion on the part of customers or advertisers between the two brands.  No third parties will be harmed by Defendants' use of social media to market Plastics Boutique's products.

Plaintiff's concerns about dilution of its trademark are unavailing because Plaintiff has not sought to enforce his trademark rights against any other retailer

selling "Plastics"- and "The Plastics"-branded merchandise.  Notably, those retailers include Target and Amazon—each with more extensive reach and broader audiences than Plastics Boutique.  Plaintiff will not be harmed by returning to the status quo of online coexistence between Plastics NYC and Plastics Boutique that occurred for four years.

Defendants seek an injunction ordering the social media platforms that removed their posts restore their accounts.  (ECF No. 19, PageID #232.)  But none is a party, and the Court very much doubts it can order such action from non-parties. Therefore, the scope of the injunction is necessarily circumscribed by the parties who are before the Court.

## IV.  Public Interest

Plaintiff argues that the public has an interest in protecting trademark registrants from infringement.  (ECF No. 23, PageID #318.)  True enough. Defendants counter that, while "the public has an interest in protecting rights holders from infringement, it has an equal and co-existent interest in fostering legal competition and preventing monopolistic trade."  (ECF No. 19, PageID #230 (citing *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996).)

Trademark protection serves both consumers and producers.  Trademark law protects the public by "making consumers confident that they can identify brands they prefer and can purchase those brands without being confused or misled." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 784 n.19 (Stevens, J., concurring) (quotation omitted).  Trademark laws protect trademark owners who have "spent

26

considerable time and money bringing a product to the marketplace" from "pirates and counterfeiters." *Id.* (cleaned up).

On this record, Defendants have clearly shown that Plaintiff has a weak trademark, and no evidence of confusion exists between the two brands. Accordingly, the public interest is not served by preventing Plastics Boutique from marketing and selling its products on social media because the public is not "being deceived into purchasing an infringing unwanted product." *Beer Nuts,* 477 F.2d at 328. Declining to enjoin Plaintiff would protect its trademark rights by keeping Defendants off social media. Ultimately, however, those trademark rights are weak, and Plaintiff would not suffer any harm if enjoined. Plastics NYC remains free to market its products on social media and otherwise. Plastics Boutique is not the type of "pirate" or "counterfeiter" that trademark law is supposed to inhibit—it is the senior user of a weak trademark in a crowded marketplace of similar clothing.

## V.     Bond

Rule 65(c) provides that a court may only issue an injunction "if the movant gives security" in a proper amount. Under the law of this Circuit, however, a district court has discretion whether to require the posting of a bond or other security. *See Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.,* 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)). Because the record shows that Plaintiff will suffer little, if any, harm from the issuance of an injunction, the Court exercises its discretion to dispense with the requirement of a bond or other security.

## CONCLUSION

For the foregoing reasons, and balancing the equities under Rule 65, the Court finds that Defendants have clearly shown a likelihood of success on their declaratory judgment claim, specifically that Plaintiff's trademark is weak and that there is not a likelihood of confusion between the two clothing brands.  Additionally, Defendants have shown that they will suffer irreparable harm absent an injunction.  No third parties will suffer substantial harm, and the public interest weighs in favor of granting an injunction.  Accordingly, the Court **GRANTS IN PART** Defendants' motion for a preliminary injunction.

Specifically, the Court **ORDERS** that Plaintiff and its officers, directors, employees, agents, subsidiaries, and distributors, are prohibited and enjoined from directly or indirectly:

(1)    interfering or attempting to interfere with Plastics Boutique's relationships with social media platforms and its social media accounts;

(2)    contacting social media companies about Defendants' social media accounts without express permission from the Court;

(3)    contacting social media companies with requests based upon trademark holder rights as alleged in this action to remove, take-down, or modify content posted by Defendants; and/or

(4)    aiding, assisting, directing, or abetting any other individual or entity in doing any act prohibited by this Order.

Additionally, the Court **ORDERS** Plaintiff to send this Order to appropriate individuals at each social media company with whom or which he previously communicated and to request that any and all restrictions placed on Defendants' accounts or posts be lifted.  No later than noon on Thursday, August 29, 2024, the Court **ORDERS** Plaintiff to file a declaration verifying compliance with this Order and providing evidence of the same.  Defendants are also authorized to distribute this Order to the appropriate individuals at social media companies.

**SO ORDERED.**

Dated:  August 25, 2024

_____
        J. Philip Calabrese
        United States District Judge
        Northern District of Ohio