## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PLASTICS NYC, LLC, | ) | Case No. 1:23-cv-02291 |
| | ) | |
| Plaintiff and | ) | Judge J. Philip Calabrese |
| Counter-Claim Defendant, | ) | |
| | ) | Magistrate Judge Reuben J. Sheperd |
| v. | ) | |
| | ) | |
| PLASTICS BOUTIQUE, LLC, *et al.*, | ) | |
| | ) | |
| Defendants and | ) | |
| Counter-Claim Plaintiffs. | ) | |
| | ) | |

## OPINION AND ORDER

In this trademark infringement action, competing clothing companies use the phrase "The Plastics" in the design, marketing, and promotion of their respective product lines. Each claim superior intellectual property rights in that mark. Following discovery and the Court's grant of a preliminary injunction for Defendants on August 25, 2024, both parties moved for summary judgment. In this ruling, the Court takes up both motions.

## MOTIONS TO STRIKE

As a threshold matter, Defendants filed two motions to strike part or all of Plaintiff's replies. (ECF No. 58; ECF No. 61.) "A court has broad discretion in determining whether to grant a motion to strike." *Hogan v. Guardian Life Ins. Co. of America*, No. 1:23-cv-02146, 2024 WL 3554951, at *2 (N.D. Ohio July 23, 2024) (citations omitted).

On March 3, 2025, the Court entered an Order setting an amended four-brief schedule for summary judgment briefing. (ECF No. 54.) In that Order, the Court specified that (1) Plaintiff's combined opposition and cross-motion for summary judgment—the second brief in the series—was not to exceed 40 pages in length, (2) Defendants' combined opposition and cross-motion for summary judgment—the third brief—was not to exceed 40 pages in length, and (3) Plaintiff's reply, the fourth and final brief in the cycle, was not to exceed 15 pages. (*Id.*, PageID #1449.)

First, Defendants move to strike Plaintiff's reply. (ECF No. 58.) They claim that, when Plaintiff's reply is added to Plaintiff's combined opposition and cross-motion for summary judgment, it "totaled 49 pages, nine pages over the limit." (ECF No. 58, PageID #1547.) But the Court's amended scheduling Order stated that Plaintiff's combined opposition and cross-motion for summary judgment was not to exceed 40 pages in length, while Plaintiff's *reply* was not to exceed 15 pages in length. (ECF No. 54, PageID #1449.) Therefore, Plaintiff's 15-page reply complies with the Court's Order. For that reason, the Court **DENIES** Defendants' first motion to strike. (ECF No. 58.)

Second, Defendants move to strike Plaintiff's amended reply, which turns out to be an amended version of Plaintiff's combined opposition and cross-motion for summary judgment—that is, the second brief on the schedule, not the fourth. (ECF No. 61.) For the reasons previously explained, Defendants are incorrect that this 34-page amended brief combined with Plaintiff's reply places Plaintiff's briefs over the page limits in the schedule. (ECF No. 61, PageID #1620.) Further, the amended brief

includes only one material difference between the previous one it replaces. The amended brief adds an alleged interaction that took place on Instagram on June 1, 2025 between Jayvon Johnson—the principal of Plastics NYC, LLC—and an Instagram user that Plaintiff argues constitutes evidence of confusion. (ECF No. 60, PageID #1571.) Plaintiff claims to have shared the screenshot of this interaction with Defendants. (*Id.*) Any other differences in the briefs involve changes to formatting and exhibit numbers—with the one addition being the screenshot of the alleged Instagram interaction on June 1, 2025. (*Compare* ECF No. 55 *with* ECF No. 60; ECF No. 60-6.) Because Plaintiff represents that it shared the additional screenshot of the social media interaction with Defendants, the Court finds that considering that evidence does not prejudice any party. Therefore, the Court **DENIES** Defendants' second motion to strike. (ECF No. 61.)

## STATEMENT OF FACTS

Plaintiff and Defendants filed cross-motions for summary judgment. In this procedural posture, the Court construes the facts in Plaintiff's favor in ruling on Defendants' motion for summary judgment, and in Defendants' favor in ruling on Plaintiff's motion for summary judgment.

Testimony from the preliminary injunction hearing forms part of the record that may be considered on summary judgment. *See* Fed. R. Civ. P. 56(c)(3); *see also* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2721 & n.12 (4th ed.). Indeed, the parties rely on that record throughout their briefs. The record establishes the following facts.

A.     **The Parties**

A.1.   **Plastics NYC, LLC**

Plaintiff Plastics NYC, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.  (ECF No. 1, ¶ 5, PageID #2.) Its sole member, Jayvon Johnson, incorporated Plastics NYC on June 1, 2020.  (ECF No. 34, PageID #454; ECF No. 49-1, PageID #576–77.)   Mr. Johnson has responsibility for the company's "day-to-day activities, financial decisions, marketing and advertising efforts, and product design and distribution."  (ECF No. 57, PageID #1533; ECF No. 49-1, PageID #580–86.)

According to Plastics NYC, it is an online clothing retailer that focuses on "streetwear, including hoodies, jackets, and joggers" targeted at "young women to middle-aged women."  (ECF No. 60, PageID #1573.)   However, at the preliminary injunction hearing, Mr. Johnson testified that Plastics NYC sells clothes for men and women.  (ECF No. 34, PageID #455, #477 & #482.)   Plastics NYC's products range in price from $40 to $300 or more.  (ECF No. 28, PageID #333.)   It sells products that are "superior" in "quality and creativity" to Plastics Boutique's.  (ECF No. 34, PageID #476 & #481.)   Plastics NYC claims that it has expanded from offering a single t-shirt design to various products and continues to expand its offered products.  (ECF No. 34, PageID #477.)

A.1.a. **Origins of the Name**

The *Mean Girls* movie depicted a group of fashion-conscious teens who are referred to as "The Plastics."  (ECF No. 34, PageID #397–98.)   Plastics NYC uses the

4

mark "The Plastics" on its products and in connection with its marketing efforts. (ECF No. 49, PageID #656–57.)

Mr. Johnson's representations of the origins of the company's name are inconsistent. At the preliminary injunction hearing, Mr. Johnson testified that his "brand doesn't really refer back to *Mean Girls*." (ECF No. 34, PageID #475.) Further, he claimed that the inspiration for the "Plastics" mark "doesn't come from the *Mean Girls* movie," but rather from what certain people in New York City called his group of friends. (*Id.*, PageID #487–88.) However, in Plaintiff's motion for summary judgment, Mr. Johnson concedes that the mark "stem[med]" from a similar phrase used in the 2004 film *Mean Girls*, but that the "style and inspiration" of Plastics NYC's clothing is "separate and distinct from the movie." (ECF No. 60, PageID #1556.) Though he cites his deposition testimony to support that position, his testimony aligns with his testimony at the preliminary injunction hearing. (ECF No. 49, PageID #586; ECF No. 34, PageID #487–88.) Plastics Boutique characterizes the phrase as being "taken" from the film, citing Plastics NYC's interrogatory response that "Mr. Johnson correlated their distinct style with the 'Mean Girls' film." (ECF No. 51-1, PageID #1245–46.)

### A.1.b. First Use of "Plastics"

As early as July 2016, Mr. Johnson claims to have used "Plastics" phrasing on clothing and that members of the New York City "fashion community" referred to him and his "crew" as "The Plastics." (ECF No. 34, PageID #487–88.) Plastics NYC's complaint includes a photograph purportedly from Mr. Johnson's personal Instagram account of him wearing a shirt with "Plastics" phrasing dated July 16, 2016:



(ECF No. 1, ¶ 16, PageID #4.)  Further, Mr. Johnson maintains that he wore and sold "Plastics" marked, screen-printed t-shirts in-person and on Instagram beginning in July 2016 and through Plastics NYC's incorporation in 2020.  (ECF No. 34, PageID #479–80.)  Plastics Boutique argues that, aside from the July 2016 photograph, Mr. Johnson has not produced any evidence showing that he used "Plastics" marked clothing in commerce during this four-year period.  (ECF No. 51-1, PageID #1264; ECF No. 49-1, PageID #584.)

### A.1.c. Marketing and Market Performance

Plastics NYC's website became active on July 1, 2020, or shortly before then.  (ECF No. 28, PageID #333.)  It relies on social media platforms and the world wide web for marketing.  (ECF No. 34, PageID #440, #456 & #466.)  As of early 2025, Mr. Johnson claims that Plastics NYC's Instagram account had approximately 9,490 followers and that its TikTok account had 327 followers.  (ECF No. 60-8, ¶ 16, PageID #1617.)

Plastics NYC's Instagram account was the victim of fraud, which restricted its social media reach and growth, which, in its view, allowed Plastics Boutique "to capitalize off Plastic[s] NYC['s] restricted social media."  (ECF No. 60, PageID #1560; ECF No. 49-1, PageID #632–33.)  The parties agree that Plastics NYC's Facebook and Instagram accounts are prohibited from purchasing advertisements.  (ECF No. 51, PageID #1215; ECF No. 60, PageID #1561; ECF No. 49-1, PageID #632–33.)  Regarding paid advertising, Mr. Johnson claims that "Instagram . . . and Facebook [are] the only [platforms he has] . . . put any . . . money into.  Years ago."  (ECF No. 49-1, PageID #634.)  Likewise, Plastics Boutique points out that Mr. Johnson and

Plastics NYC were unable to advertise on Facebook or Instagram since 2019 or 2020 and that Mr. Johnson's advertising efforts on other sites were unproductive. (ECF No. 49, PageID #634.) In any event, Plastics NYC contends that its products have "been worn and marketed by public figures on platforms that garnish worldwide recognition." (ECF No. 60, PageID #1578.) But it provides no evidence in the record supporting this assertion.

Mr. Johnson claims that Plastics NYC has generated approximately $213,644.62 in revenue from 2016 to 2024. (ECF No. 49-1, PageID #651–52; ECF No. 51-1, PageID #1248; ECF No. 51-2.) Plastics NYC's gross sales indicate that its first sale occurred on or about June 26, 2020. (ECF No. 51-2, PageID #1276.) Further, its gross receipts in 2021 and 2022 amounted to about $56,000. (ECF No. 51-3, PageID #1284 & #1286.) According to Plastics Boutique, Plastics NYC's revenue increased, rather than decreased, following Plastics Boutique's alleged trademark infringement according to the company's profit and loss statements. (ECF No. 51-2; ECF No. 51-5.)

### A.2.  Plastics Boutique, LLC

Defendant Plastics Boutique, LLC is an Ohio business incorporated on January 18, 2019. (ECF No. 19-1, ¶ 4, PageID #234; ECF No. 34, PageID #396.) Defendant Angel Adams owns Plastics Boutique and, according to Plastics NYC, "handles every aspect of the business, including all the social media posting and engagement." (ECF No. 60, PageID #1586.) Ms. Adams admits that she is "intimately involved in running Plastics Boutique." (ECF No. 34, PageID #396.) She

began developing the idea for her brand as early as 2017 and claims inspiration from the 2004 film *Mean Girls*.  (ECF No. 34, PageID #397–98.)

### A.2.a. Products

Plastics Boutique sells only women's clothing and focuses on "urban active and loungewear and related accessories."  (ECF No. 50-1, PageID #1011; ECF No. 34, PageID #413.)  While acknowledging that the offerings are "not identical," Plastics NYC maintains that the two brands sell "the same type of clothing in almost identical font" and that their "items and business strategies are very similar."  (ECF No. 60, PageID #1559.)  Specifically, Plastics NYC presents itself and Plastics Boutique as both "offer[ing] streetwear and accessories to women."  (*Id.*, PageID #1573; *see also* ECF No. 34, PageID #401, #413 & #476; ECF No. 50-1, PageID #1011–12.)  Further, Plastics NYC notes that Plastics Boutique has "expanded its brand to include headwear, loungewear, and jerseys."  (ECF No. 55, PageID #1471 (citing a link to Plastics Boutique's website).)  Plastics Boutique's products are generally less expensive than Plastics NYC's.  (ECF No. 34, PageID #478.)

### A.2.b. Marketing and Market Performance

Both Plastics NYC and Plastics Boutique rely on social media platforms and the internet for marketing.  (ECF No. 34, PageID #440, #456 & #466.)  The parties agree that—at the time of filing—Plastics Boutique had approximately 77,000 Instagram followers and 25,000 TikTok followers.  (ECF No. 34, PageID #406–07; ECF No. 19-1, ¶ 18, PageID #236; ECF No. 50-1, PageID #1039.)  Plastics NYC claims that Plastics Boutique gained 40,000 to 50,000 of its Instagram followers after a

single viral post, but that both brands' social media profiles otherwise grew at similar rates.  (ECF No. 34, PageID #447–48.)

Plastics Boutique used social media influencers to market its products on Instagram and TikTok.  (ECF No. 19-1, ¶ 13, PageID #235; ECF No. 34, PageID #410–12; ECF No. 50-1, PageID #1070.)  Plastics NYC maintains that both it and Plastics Boutique "utilize[d] the same social media influencers."  (ECF No. 60, PageID #1558.)  But Mr. Johnson testified that he could not "confirm that . . . that's accurate but [he] was in communication with one . . . influencer . . . [b]ut . . . our target market is similar so the influencers that we're in communication with are similar."  (ECF No. 49-1, PageID #698.)

Plastics NYC suggests that Plastics Boutique's comparatively larger social media success represents a "key reason" why Plastics NYC has a smaller social media presence and fewer sales.  (ECF No. 60, PageID #1579; ECF No. 51-2.)  In 2021 and 2022, based on its tax records, Plastics NYC spent less than $12,000 in advertising.  (ECF No. 51-5.)  An email from Mr. Johnson to a potential collaborator in October 2021 indicated that he did not "have a budget for paid collaborations."  (ECF No. 51-4, PageID #1287.)

In 2023, Plastics Boutique posted over $700,000 in clothing sales.  (ECF No. 51-9, ¶ 4, PageID #1329.)  Plastics NYC dismisses this figure as "unsupported" in the declaration of Ms. Adams.  (ECF No. 60, PageID #1560.)

### B.    Allegedly Infringing Mark

In April 2019, Plastics Boutique started using the phrase "Plastics" on items marketed on its Instagram account and sold in its online store.  (ECF No. 51-1,

PageID #1010–11, #1014–15 & #1045–46.)  This arrangement—marketing on social media and selling through the online store—remained Plastics Boutique's business model thereafter.  (ECF No. 19-1, ¶¶ 12–14, PageID #235.)  Plastics NYC acknowledged that Plastics Boutique used the phrase with a "woman's silhouette serving as the 'T,'" which was distinct from Plastics NYC's use of the term with its items.  (ECF No. 60, PageID #1555; ECF No. 60-1.)

In early 2021, Plastics Boutique started selling a varsity jacket that displayed the phrase "The Plastics" without the woman's silhouette:





♡ 576   💬 27   ✈ 2                                              🔖

**shopplastics** i Don't miss let alone miss you
-Love Plastics 💕 ... more

January 26, 2022

(ECF No. 60-3, PageID #1600; ECF No. 34, PageID #444.)  Plastics NYC claims that this jacket was first sold on November 5, 2021.  (ECF No. 34, PageID #444; ECF No. 60-2, PageID #1592.)  Alternatively, it maintains that the first use of this mark began on September 9, 2020 at the earliest and on January 26, 2022 at the latest. (ECF No. 50-1, PageID #1014– 15 & #1020; ECF No. 50-2, PageID #1202.)

Plastics NYC contends that these items constitute the first use and use in commerce of Plastics Boutique's allegedly infringing mark that led to the current litigation.  (ECF No. 34, PageID #444.)  Further, Plastics NYC noted that it suffered a financial loss in both 2020 and 2021 and states that it is "not a coincidence" that these losses followed Plastics Boutique's updated design.  (ECF No. 60, PageID #1579; ECF No. 51-2; ECF No. 51-5.)  However, Plastics NYC admitted that it increased its income overall when it "operat[ed] contemporaneous[ly] with Plastics Boutique."  (ECF No. 34, PageID #469.)

### B.1.  Notice

At the preliminary injunction hearing, the record showed that Mr. Johnson had not conducted an extensive search into other uses of the "Plastics" mark before he created Plastics NYC.  (ECF No. 28, PageID #333.)  He only searched for the phrase on Instagram and did not search more broadly.  (*Id*.)  But even "a simple Google search at the time reveal[ed]" many other "Plastics"-branded clothing from other retailers.  (*Id.*, PageID #340.)  Meanwhile, Ms. Adams "did some due diligence" before incorporating Plastics Boutique and discovered one other Ohio seller that used

"Plastics" on its clothing.  (*Id.*, PageID #335.)  No party disputed these facts in their subsequent motions for summary judgment.

The parties agree that Mr. Johnson first learned of Plastics Boutique in June 2022 after discovering its "Plastics"-branded items on social media.  (ECF No. 34, PageID #461.)  But during the preliminary injunction hearing, Mr. Johnson testified that he knew of Plastics Boutique before March 29, 2022—or before he filed a trademark for "The Plastics."  (ECF No. 28, PageID #336.)  Then, the record supported a finding that Mr. Johnson's knowledge of Plastics Boutique led him to file for "The Plastics" trademark.  (*Id.*)  Additionally, the record at that stage of the proceedings showed that Ms. Adams had no knowledge of Plastics NYC or Mr. Johnson until she received a cease-and-desist letter dated September 7, 2023.  (*Id.*, PageID #337.)

### B.2.  Claimed Confusion

Mr. Johnson maintains that he received "confusion inquiries" from third parties regarding the two brands.  (ECF No. 49, PageID #688–90; ECF No. 60-5; ECF No. 60-6.)  He notes that two stylist acquaintances asked whether Plastics NYC was behind Plastics Boutique's "The Plastics" varsity jackets that appeared for sale on social media, providing evidence that one stylist messaged him on August 5, 2023. (ECF No. 49, PageID #573 & #688; ECF No. 60-5.)  Further, on June 1, 2025, an Instagram user inquired by direct message whether Plastics NYC manufactured a Plastics Boutique item marketed on the social media site.  (ECF No. 60-6.) Ms. Adams testified that no one has expressed confusion to her regarding the two brands.  (ECF No. 28, PageID #335.)  Additionally, Plastics Boutique points out that

the record contains no evidence that any consumer actually bought a Plastics Boutique item believing it was from Plastics NYC.  (ECF No. 51, PageID #1222.)

### B.3.    Plastics NYC's Trademark Registration

From November 26, 2013 to June 3, 2020, Yvonne Nicoletti, who is not a party to this litigation, owned "The Plastics" trademark registered under the United States Patent and Trademark Office registration number 4439914.  (ECF No. 19-2, PageID #271–72.)  On this trademark application, Nicoletti indicated that the mark was first used at least as early as January 1, 2009 and first used in commerce at least as early as January 15, 2009.  (*Id.*, PageID #277.)  No party has an agreement with Nicoletti regarding this trademark.  (ECF No. 19-3; PageID #282; ECF No. 51-8, PageID #1322.)

On March 29, 2022, Plastics NYC applied for a trademark for the phrase "The Plastics" for use on:  "Dresses; Hats; Pants; Shirts; Shorts; Skirts; Tops as clothing; Sweatshirts; T-shirts," but not jackets.  (ECF No. 19-2, PageID #249.)  On its trademark application, Plastics NYC indicated that the first use of the phrase was at least as early as July 1, 2020 and that its first use in commerce was on the same date.  (ECF No. 19-2, PageID #249.)  On May 16, 2023, the USPTO approved Plastics NYC's application and issued it a trademark, setting the first use in commerce date as July 1, 2020.  (ECF No. 19-2, PageID #269.)

On September 27, 2023, Plastics NYC requested a voluntary amendment to its trademark registration.  (ECF No. 19-2, PageID #257.)  Plastics NYC proposed to change the date of the first use of the mark to January 1, 2018.  (*Id.*)  Mr. Johnson testified that he filed his original trademark application without the help of an

attorney and claims that he did not understand that his first use of the mark could predate the formation of Plastics NYC.  (ECF No. 49-1, PageID 664–65.)  Initially, the USPTO did not accept the request for amendment because it did not contain an affidavit or declaration explaining how the error occurred.  (ECF No. 19-2, PageID #262.)

Subsequently, Plastics NYC submitted an affidavit to support the correction, representing that Mr. Johnson, not Plastics NYC, first used the mark in commerce on July 24, 2016.  (ECF No. 19-2, PageID #268.)  On July 30, 2024, the USPTO issued an updated registration setting the first use of the trademark anywhere as July 24, 2016 and the first use of the trademark in commerce as July 1, 2020.  (ECF No. 19-2, PageID #269.)  As of July 24, 2016, Ms. Nicoletti owned the trademark and did so through July 3, 2020.  (ECF No. 19-2, PageID #271–72.)  However, the USPTO did grant Plastics NYC a first use in commerce date of July 1, 2020, before Ms. Nicoletti's trademark expired.  (ECF No. 19-2, PageID #269.)

## C.    Plastics NYC's Efforts to Enforce Its Mark

### C.1.    Cease-and-Desist Letter

In June 2022, Plastics NYC learned about Plastics Boutique through social media.  (ECF No. 51-1, PageID #1250–51.)  On September 7, 2023, Plastics NYC sent a cease-and-desist letter to Plastics Boutique and Angel Adams, advising that it owned a trademark for the phrase "Plastics" that it first used "on July 1, 2020."  (ECF No. 1-10, PageID #69.)  Plastics NYC's letter stated that Defendants' continued use of the mark constituted trademark infringement and that Plastics NYC would pursue legal remedies if Defendants continued their use.  (*Id.*, PageID #69–70.)  On October

16

5, 2023, Ms. Adams informed Plastics NYC by email that she believed that she was the senior user of the mark.  (ECF No. 19-1, ¶ 20, PageID #236 & #242.)

Plastics NYC only sent a cease-and-desist letter to Defendants and did not pursue other trademark infringement claims against any other retailer.  (ECF No. 51-1, PageID #1253.)  Plastics NYC confirmed that it has not sent cease-and-desist letters to retailers such as Target, Kohls, or Amazon.com, but maintains that these and other similar outlets clearly reference the *Mean Girls* film on their products.  (ECF No. 57, PageID #1536.)  After the cease-and-desist letter, Defendants blocked Plastics NYC on social media.  (ECF No. 49, PageID #680.)

### C.2.  Self-Help Measures

In November 2023, Mr. Johnson reported many of Plastics Boutique's posts on Instagram and TikTok because he believed that they infringed on his trademark rights.  (ECF No. 19-1, ¶ 21, PageID #236; ECF No. 49-1, PageID #685; ECF No. 50-1, PageID #1039–40.)  Instagram removed the posts from Plastics Boutique's page and suspended its account "for a period of time." (ECF No. 19-1, ¶ 21, PageID #236.) Ms. Adams testified that Instagram reinstated the profile later that day, but the individual posts did not reappear automatically.  (ECF No. 28, PageID #338.) Further, some of Plastics Boutique's social media content has become "unrecoverable."  (ECF No. 51-9, ¶¶ 9–10, PageID #1330.)

Following an "independent trademark infringement investigation," TikTok suspended Plastics Boutique's account around June 1, 2024.  (ECF No. 34, PageID #470.)  Plastics Boutique created a second TikTok account following the first account's suspension.  (ECF No. 19-1, ¶¶ 29–30 PageID #237.)  On August 1, 2024, Mr. Johnson

17

reported Plastics Boutique's second TikTok account for trademark infringement, and TikTok then suspended that account.  (ECF No. 19-1, PageID #244; ECF No. 34, PageID #407; ECF No. 50-1, PageID #1039.)  These actions prompted Defendants' motion for a preliminary injunction.

Without access to its social media marketing channels, Plastics Boutique experienced a substantial drop in social media engagement and its webpage through which it sells its products.  (ECF No. 34, PageID #440; ECF No. 30.)  Previously, for example, Plastic Boutique had approximately 25,000 followers on TikTok.  (ECF No. 51-9, ¶ 10, PageID #1330.)  Following Plastics NYC's report to TikTok, that number dropped below 5,000 and has not recovered.  (*Id.*, ¶¶ 11–13, PageID #1330–31.)

## STATEMENT OF THE CASE

On November 28, 2023, Plastics NYC sued Plastics Boutique and Angel Adams for trademark infringement.  (*See generally* ECF No. 1.)  Plastics NYC and Mr. Johnson have not pursued trademark claims against any other retailer selling "Plastics"-branded or "The Plastics"-branded merchandise.  (ECF No. 51-1, PageID #1245–46.)  Plaintiff asserts various federal causes of action and one common-law claim:  (1) trademark infringement, 15 U.S.C. § 1114; (2) unfair competition, 15 U.S.C. § 1125(a); (3) dilution of trademark, 15 U.S.C. § 1125(c); (4) unfair and deceptive trade practices, 15 U.S.C. § 45(a); and (5) common-law trademark infringement and unfair competition.  (ECF No. 1, ¶¶ 39–60, PageID #12–15.)

Defendants bring counterclaims for: (1) a declaratory judgment that Plaintiff's trademark is invalid and unenforceable or, in the alternative, that Defendant's use of the terms "Plastics" or "The Plastics" does not constitute infringement; (2) a claim for tortious interference with business relationships; and (3) a claim for unfair competition. (ECF No. 15, ¶¶ 21–59, PageID #190–95.)

On August 8, 2024, Defendants moved for a preliminary injunction and expedited hearing, seeking (1) to enjoin Plaintiff and its authorized agents "from directly or indirectly interfering or attempting to interfere with [Defendants'] relationships with social media platforms and its social media accounts" and (2) an order to non-party social media sites to reinstate Defendants' accounts. (ECF No. 19, PageID #214.) On August 16, 2024, the Court held an evidentiary hearing on Defendants' motion. (ECF No. 24.)

The Court granted in part Defendants' motion for a preliminary injunction. (ECF No. 28.) In its ruling, the Court determined that Defendants had clearly shown a likelihood of success on their declaratory judgment claim, specifically that Plaintiff's trademark is weak and that there is not a likelihood of confusion between the two clothing brands. (*Id.*, PageID #359.) Further, the Court determined that Defendants satisfied the other elements warranting a preliminary injunction. (*Id.*) Therefore, the Court enjoined Plaintiff from (1) interfering with Defendants' relationships with social media platforms, (2) contacting social media companies about Defendants, (3) requesting that social media companies remove, take-down, or modify Defendants'

19

content, and (4) assisting any other individual or entity in doing any of these prohibited acts.  (*Id.*)

Following additional discovery, Defendants moved for summary judgment in their favor on all of Plaintiff's claims and on their counterclaims.  (ECF No. 51.) Plaintiff filed a cross-motion for summary judgment in its favor on all its claims and on Defendants' counterclaims.  (ECF No. 55; ECF No. 60.)

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008).  After discovery, summary judgment is appropriate if the nonmoving party fails to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial."  *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court's function at this stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Celotex Corp.*, 477 U.S. at 322). Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson,* 477 U.S. at 250). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

If a genuine dispute exists, meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250). However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48). "Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned up) (citations omitted). "Conclusory statements unadorned with

supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record; instead, the parties must bring those facts to the Court's attention. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). Ultimately, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251.

"[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Therefore, cross-motions for summary judgment do not warrant granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. *Langston v. Charter Twp. of Redford*, 623 F. App'x 749, 755 (6th Cir. 2015).

## I.    Plaintiff's Claims

### I.A.    Trademark Infringement

The Lanham Act prohibits an individual or entity from using in commerce, without the consent of the registrant, "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale,

22

distribution, or advertising of any goods" if "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). To establish trademark infringement under the Lanham Act, the plaintiff must show that: (1) it owns a trademark, (2) the infringer used the mark in commerce without authorization, and (3) the use of the alleged infringing trademark "is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (citing *Leelanau Wine Cellars, Ltd v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007)).

The parties concede the first element, but dispute (1) whether Defendants' alleged first use of the mark in commerce trumps Plaintiff's claim and (2) whether Defendants' use of the mark is likely to cause confusion. (ECF No. 51, PageID #1218–24; ECF No. 60, PageID #1566–76; ECF No. 56, PageID #1516–19; ECF No. 57, PageID #1532–35.)

### I.A.1. Senior User

"Rights in a trademark are determined by the date of the mark's first use in commerce." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015). Accordingly, trademark "ownership is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and actual use in the market." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991) (citation omitted). Although federal registration of a trademark grants nationwide priority as of the filing date of an application for registration, 15 U.S.C. § 1057(c), the registrant's rights "are always subject to any superior common law rights acquired by" the senior user of a mark. *Allard Enters., Inc. v. Advanced*

*Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001); *see also* 15 U.S.C. § 1057(c).  The first person to use a mark in commerce is the "senior user" and obtains common-law ownership in the geographic area where the mark is used—even if the use of the mark is not extensive and does not result in widespread recognition.  *Allard Enters.*, 249 F.3d at 572.

### I.A.1.a. First Use in Commerce

"In the Sixth Circuit, 'trademark or service mark ownership is not acquired by federal or state registration.  Rather, ownership rights flow only from prior appropriation and actual use in the market.'" *Bodine Perry, PLLC v. Bodine*, 667 F. Supp. 3d 617, 628 (N.D. Ohio Mar. 31, 2023) (citation modified) (quoting *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 356 (6th Cir. 1998)). "[T]he plaintiff has the burden of proof to establish first use of its trademark in every specific geographic area in which it claims superior rights." *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 715 (E.D. Mich. 2015) (citation omitted).

It is undisputed that Plastics Boutique was incorporated in Ohio on January 18, 2019.  (ECF No. 19-1, ¶ 4, PageID #234; ECF No. 34, PageID #396; ECF No. 51, PageID #1210.)  Further, Mr. Johnson testified that Defendants used "Plastics"-branded clothes in commerce through Plastics Boutique's website and social media sites as early as 2019.  (ECF No. 34, PageID #462.)  This use in commerce predates both the date of Plaintiff's application for trademark registration and its amended first use in commerce date.  (ECF No. 19-2, PageID #269.)  Additionally, this use in commerce predates Plaintiff's incorporation date.  (ECF No. 34, PageID #454; ECF No. 49-1, PageID #576–77.)  Notably, the USPTO denied Mr. Johnson's request to

amend Plastics NYC's first use of the mark in commerce to 2016.  (ECF No. 19-2, PageID #262.)

In its preliminary injunction ruling, the Court disregarded the USPTO's amended first use in commerce date for Plastics NYC because the Court determined that it was "procured in aid of [a] position taken for litigation purposes."  (ECF No. 28, PageID #345.)  But even accepting this date as accurate, construing the record in favor of Plastics NYC, Defendants' first use of the mark in commerce anywhere predates the USPTO's stated first use date of July 1, 2020.  (ECF No. 19-2, PageID #269.)  Accordingly, the record demonstrates that Defendants used the "Plastics" mark in commerce before Plaintiff.

Nonetheless, Plaintiff maintains that its first use of the mark in commerce occurred in July 2016.  (ECF No. 60, PageID #1555–56.)  In support, it points to a single Instagram post from July 16, 2016 that purportedly shows Mr. Johnson wearing a "Plastics"-marked t-shirt.  (ECF No. 1, ¶ 16, PageID #4.)  But Plaintiff cannot say that anyone purchased the t-shirt.  (ECF No. 49-1, PageID #584.)  Even when viewed in the light most favorable to Plaintiff, this post does not contain or suggest any advertisements for or sales of the t-shirt or any other product.  (ECF No. 49-1, PageID #579.)  Therefore, Plaintiff presents no more than a scintilla of evidence, at most, to support his use of the mark as early as 2016.  Nor does Plaintiff point to any evidence that it first used the trademark in Ohio or another specific geographic area other than New York City.  *See Innovation Ventures* 90 F. Supp. 3d at 715.  Plaintiff fails to present evidence showing that it, rather than Defendants, is

the senior user of the "Plastics" mark or creating a genuine dispute of material fact on the issue.

### I.A.1.b. Continuity of Use

"A party establishes a common law right to a trademark only by demonstrating that its use of the mark was 'deliberate and continuous, not sporadic, casual or transitory.'" *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054–55 (6th Cir. 1999) (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir. 1974)). However, the senior user need not prove "deep market penetration or widespread recognition"; rather, "even a single use in trade may sustain trademark rights if followed by continuous commercial utilization." *Allard Enters.*, 146 F.3d at 358 (citation omitted).

Again, the parties agree that Defendants used the "Plastics" mark in commerce beginning as early as 2019 and continuing through the beginning of this action. (ECF No. 34, PageID #462.) On this point, the record contains extensive evidence and leaves no doubt. Both parties attach numerous images of "Plastics"-marked clothing on Defendants' various online and social media sites dating from 2019 to 2024. (ECF No. 50-2, PageID #1200–02 & #1204–07.) Further, the parties present evidence that Defendants sold various "Plastics"-marked clothing in this time frame, including, but not limited to, bomber jackets with the alleged infringing mark. (ECF No. 60-3; ECF No. 34, PageID #444.)

Also, Plaintiff agrees that the record shows that Plastics Boutique "expanded its brand" since 2019, which suggests that Defendants continuously used the "Plastics" mark in commerce. (ECF No. 60, PageID #1574; ECF No. 34, PageID #477.)

26

While the parties disagree on the extent of the public's association of the "Plastics" mark with either brand, neither "deep market penetration [n]or widespread recognition" is required for the Court to establish continuous use. *Allard Enters.*, 146 F.3d at 358. Therefore, the record leaves no doubt that Defendants' use of the "Plastics" mark in commerce meets the continuity of use element in the senior user analysis.

### I.A.1.c. Infringing Mark

Plaintiff claims that, beginning in early 2021, Plastics Boutique began using an "infringing mark" in commerce. (ECF No. 50-1, PageID #1020; ECF No. 50-2, PageID #1202.) Specifically, Plaintiff references Defendants' use of a "plain letter" "Plastics" mark in place of its prior use of a woman's silhouette for the letter "t." (ECF No. 60-1.) Plaintiff represents that this occasion and date constitutes Defendants' first use in commerce of the mark at issue. (ECF No. 60, PageID #1565–68.) Because Plaintiff's first use in commerce of the "Plastics" mark predates this change, Plaintiff argues that it—rather than Defendants—is the senior user of the "Plastics" mark. (*Id.*)

Plaintiff cites no statute, case law, or other authority that supports this argument. Nor has the Court's research located any. Plaintiff's USPTO registration for the "Plastics" mark lists the type of mark as a "STANDARD CHARACTER MARK." (ECF No. 1, PageID #19.) Under the Lanham Act, "[s]tandard character" marks are "words, letters, numbers, or any combination thereof without claim to any particular font style, size, or color." 37 C.F.R. § 2.52. Additionally, registrants for standard character marks must include "a standard character drawing that shows

27

the mark in black on a white background."  *Id.*  Plaintiff's USPTO registration includes such a character drawing.  (ECF No. 1, PageID #19.)

Based on these requirements, Plaintiff's own registration refutes its argument. The regulations under the Act provide that standard marks make no "claim to any particular font style."  37 C.F.R. § 2.52.  But Plaintiff premises its argument on such a change.  Accordingly, the Court determines that this argument lacks merit and cannot support Plastics NYC's claim to being the senior user of the mark.

*     *     *

The record demonstrates that Defendants used the "Plastics" mark in commerce before Plaintiff.  Plaintiff's attempts to register the mark and amend the registration date do not alter this conclusion.  Further, there is no genuine dispute of material fact that Defendants used the mark continuously following its first use in commerce.  These facts establish Defendants as the senior user of the mark, which trumps any ownership rights in the "Plastics" mark that Plaintiff might have established through trademark registration.  *Allard Enters.*, 249 F.3d at 572; *see also* 15 U.S.C. § 1057(c).

### I.A.2. Likelihood of Confusion

"The touchstone of liability" for trademark infringement under the Lanham Act is whether the allegedly infringing use of the mark—in this case, Defendants' use of "The Plastics"—"is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."  *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).  When determining whether a likelihood of confusion exists, the Court must examine and weigh the following

28

factors:  (1) the strength of the senior mark; (2) the relatedness of the goods or services; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care; (7) the intent of the defendant in selecting the mark; and (8) the likelihood of expansion of the product lines.  *Id.*  Neither Plaintiff nor Defendants examine factors (3) or (7) in their papers. Therefore, the Court limits its analysis to the others.

Likelihood of confusion involves a mixed question of law and fact.  *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir. 2002) (citing *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 624 (6th Cir. 1998)).  Disputes about the evidence regarding the factors presents a question of fact.  *Id.* at 630–31. But determining whether the facts establish a likelihood of confusion raises a question of law for the Court.  *Id.* at 631.

### I.A.2.a. Strength of Plaintiff's Mark

The first factor focuses on "the distinctiveness of a mark and its recognition among the public."  *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 427 (6th Cir. 2017) (quotation omitted).  A mark's strength is comprised of two components:  conceptual and commercial strength.  *Id.* at 428.

To determine conceptual strength, courts classify trademarks into categories of increasing distinctiveness.  *Daddy's Junky Music Stores*, 109 F.3d at 280.  "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due."  *Id.* (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1264 (6th Cir.1985)).  Further, a trademark holder may demonstrate  marketplace  recognition  through  commercial  considerations,  like

29

advertising efforts, marketing reach, or revenue. *Kibler v. Hall*, 843 F.3d 1068, 1074–76 (6th Cir. 2016).

Additionally, the strength of a mark depends on the particular conceptual category to which it belongs: "generic, descriptive, suggestive, and fanciful or arbitrary." *Therma-Scan*, 295 F.3d at 631 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 280). An arbitrary mark represents "the far extreme on 'a spectrum of increasing strength' among the categories." *Id.* (quoting *Daddy's Junky Music Stores*, 109 F.3d at 280.) "An arbitrary mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." *Daddy's Junky Music Stores, Inc.,* 109 F.3d at 280–81 (quoting *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996)).

Absent other considerations, arbitrary marks are the strongest and most distinctive type. *Id.* at 280. But "[e]ven an arbitrary trademark is not a strong mark . . . if it does not achieve broad public recognition across product lines." *Therma-Scan, Inc.*, 295 F.3d at 631 (citing *Homeowners Grp.*, 931 F.2d at 1107); *see also Hydrojug, Inc. v. Five Below, Inc.*, 625 F. Supp. 3d 684, 700 (N.D. Ohio 2022) (acknowledging that "[a] mark can be conceptually strong without being commercially strong, and thus, ultimately weak"). After determining the mark's category, the primary inquiry becomes "the extent to which people associate the mark with the product it announces." *Colors+ v. Colors+ Counseling, LLC*, No. 1:25-cv-00078, 2025

30

WL 1412499, at *25 (N.D. Ohio May 15, 2025) (citing *Progressive Distrib. Servs.*, 856 F.3d at 430).

Defendants do not dispute Plaintiff's view that "Plastics" is an arbitrary conceptual mark.  (ECF No. 60, PageID #1570.)  Indeed, the "Plastics" mark, "although consisting of words with recognized meaning in everyday speech, do[es] not have an inherent connection with the sale of [clothing]." *Daddy's Junky Music Stores*, 109 F.3d at 281.  Accordingly, the Court determines that the mark is arbitrary.

Plaintiff's use of the mark, however, has not achieved "broad public recognition across product lines." *Therma-Scan*, 295 F.3d at 631 (citing *Homeowners Grp.*, 931 F.2d at 1107).  Instead, "[t]he record is [still] replete with other examples of clothing retailers selling merchandise with . . . 'Plastics' phrasing."  (ECF No. 28, PageID #348; *see also* ECF No. 34, PageID #444.)  Such "[t]hird-party use weakens a mark because the mark is not an identifier for a single source." *Progressive Distrib. Servs.*, 856 F.3d at 429 (citing *Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*, 320 F. App'x 341, 347 (6th Cir. 2009)).  "The presumption is that the third parties have muddled the mark's source." *Id.* (citing *Kibler*, 843 F.3d at 1074).

And the record leaves no doubt about the commercial weakness of Plaintiff's mark as well.  Plaintiff fails to point to its advertising efforts, marketing reach, or revenue to support the strength of its mark. *See Kibler*, 843 F.3d at 1074–76.  Plastics Boutique far outpaces Plastics NYC on each of these commercial considerations. Specifically, the former has gained more followers on social media, spent more money on its advertising efforts, and earned more revenue than the latter.  (ECF No. 19-1,

¶ 18, PageID #236; ECF No. 34, PageID #406–07; ECF No. 50-1, PageID #1039; ECF No. 51-4, PageID #1287; ECF No. 51-5; ECF No. 51-9, ¶ 4, PageID #1329.)  On this record, a reasonable jury could not find that Plastics NYC's mark is commercially strong.

Plaintiff cites *Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 703 F. Supp. 2d 671, 698–99 (W.D. Ky. 2010), to argue that "Plastics Boutique['s] Social Media presence equates to niche recognition as opposed to broad public recognition." (ECF No. 57, PageID #1537.)  Maybe so.  While the public likely associates "Plastics" with the *Mean Girls* film over the products of either party to this lawsuit, the record leaves little doubt that Defendants have greater public recognition relative to Plaintiff.  *Kibler*, 843 F.3d at 1074–76.

For all of these reasons, the Court determines that Plaintiff's mark is both conceptually and commercially weak and that a reasonable jury could not find otherwise.

### I.A.2.b. Relatedness of the Goods

"The relatedness inquiry focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead customers to believe that they 'come from the same source, or are somehow connected with or sponsored by a common company.'"  *Therma-Scan*, 295 F.3d at 633 (citing *Homeowners Grp.*, 931 F.3d at 1109).  Accordingly, just because there might be some overlap between the products, "it does not follow that the companies compete directly for the same base of customers."  *Progressive Distrib.*, 856 F.3d at 432 (citing *Therma-Scan*, 295 F.3d at 633).

32

Generally, cases fall into three categories regarding the relatedness of the goods.  First, where parties compete directly, either through goods or services, confusion likely arises if the marks are sufficiently similar.  Second, where the goods or services are partially similar, the likelihood of confusion turns on other factors.  Third, "if the goods or services are totally unrelated, confusion is unlikely."  *Daddy's Junky Music Stores*, 109 F.3d at 282.  Goods or services do not relate to each other just because they fall within a broad category.  *Homeowners Grp.*, 931 F.2d at 1109.  Rather, they relate where the products cause confusion based on similar marketing and consumption tendencies.  *Id.*  Even if the products belong to the same general category, if they cost different amounts, the products only partially relate.  *Maker's Mark Distillery*, 679 F.3d at 421.  Courts must determine if the goods or services confuse potential customers about the product's origin, leading them to believe that the products come from the same party.  *Homeowners Grp.*, 931 F.2d at 1109.

Plaintiff and Defendants both use the term "Plastics" in relation to their clothing designs.  However, their brands offer distinct products based on different target customers.  Plastics Boutique exclusively sells women's loungewear, varsity jackets, and accessories, while Plastics NYC sells high-end streetwear for both men and women.  (ECF No. 34, PageID #413, #455, #477 & #482; ECF No. 50-1, PageID #1011.).  In the current procedural posture, the Court assumes that each party's respective products sufficiently overlap that there is a likelihood of confusion.  Still,

Plastics NYC sells higher quality clothing that costs more than Plastics Boutique's products. (ECF No. 28, PageID #333; ECF No. 34, PageID #476–78 & #481.)

Whatever the likelihood of confusion, consumers are most likely to associate each party's products with the *Mean Girls* film—not with either party to this litigation. In light of the factual disputes between the parties, the goods at issue sufficiently relate that a jury could find a likelihood of confusion. *See Homeowners* Grp., 931 F.2d at 1109.

### I.A.2.c. Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 284 (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988)). Because such evidence is often hard to find, this factor "is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Id.* (quotation omitted). Although a plaintiff "only must show a sufficient *potential* of confusion," rather than actual consumer confusion, "the fact that some confusion already has occurred favors plaintiff at least to some extent." *Id.* "[A]bsence of such evidence, in the usual case, is not weighted heavily against a plaintiff." *Champions Golf Club*, 78 F.3d at 1119.

However, "it does not follow that any type or quantum of such evidence [of actual confusion] is entitled to significant weight in the determination." *Id.* Instead, "the weight to which such evidence is entitled varies depending upon both the type and amount of confusion that occurs." *Therma-Scan*, 295 F.3d at 634. "On one end of the spectrum are persistent mistakes and confusion by actual customers . . . [o]n

the other are relatively few instances of confusion and inquiries rather than purchases. The analysis is, above all, contextual." *Kibler*, 843 F.3d at 1078 (citing *Homeowners Grp.*, 931 F.2d at 1110).

Isolated instances of actual confusion "after a significant time or a significant degree of concurrent sales under the respective marks" may indicate that no likelihood of confusion exists. *Homeowners Grp.*, 934 F.2d at 1110. And "confusion that is brief or that occurs among individuals who are not familiar with the products in question is entitled to considerably less weight than are 'chronic mistakes and serious confusion of actual customers.'" *Therma-Scan*, 295 F.3d at 634 (citing *Homeowners Grp.,* 931 F.2d at 1110).

Plaintiff supports its argument on actual confusion with three "confusion inquiries." (ECF No. 49, PageID #573 & #688; ECF No. 60-5; ECF No. 60-6.) But Plaintiff supports one of these claims of confusion only with Mr. Johnson's testimony. (ECF No. 49-1, PageID #688–89.) Another involves a direct message on Instagram that a stylist sent to Mr. Johnson on August 5, 2023. (*Id.*, PageID #573.) In that message, referencing an Instagram post of Plastics Boutique's products, the stylist says: "Not this the first time of me seeing *this brand*." (ECF No. 60-5.) (emphasis added). On June 1, 2025, almost two years after that message, another Instagram user sent Mr. Johnson a post of a Plastics Boutique item with the accompanying message: "You right?" (ECF No. 60-6.) But no evidence in the record suggests that the sender of either direct message was an actual consumer who purchased Plastics Boutique's products believing, mistakenly, they were Plaintiff's. Indeed, the user's

35

subsequent disparaging remark about Plastics Boutique suggests that she did not purchase Defendants' products. *Kibler*, 843 F.3d at 1078 (determining that "[t]he fact that none of the incidents were purchases would further prevent a jury from finding that this factor significantly helps [the plaintiff]").

In any event, an isolated example or two of actual confusion after years of commercial coexistence constitutes "relatively few instances of confusion and inquiries" instead of "persistent mistakes and confusion by actual customers." *Id.* Such a situation "may even lead to an inference that no likelihood of confusion exists." *Homeowners Grp.,* 931 F.2d at 1110. For all of these reasons, the Court determines that a reasonable jury could not find actual confusion on this record.

### I.A.2.d. Marketing Channels

This factor examines the parties' marketing approaches, which consist of "how and to whom the respective goods or services of the parties are sold." *Id.*; *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 267 (6th Cir. 2021) (quoting *Progressive Distrib. Servs.*, 856 F.3d at 434). Taken together, the likelihood of confusion decreases when: (1) "the goods are sold through different avenues"; (2) "the parties have different customers"; and (3) they "market their goods or services in different ways." *Id.* (quoting *Progressive Distrib. Servs.*, 856 F.3d at 434). Concerning online marketing, courts ask: (1) "whether both parties use the Web as a *substantial* marketing and advertising channel"; (2) "whether the parties' marks are utilized in conjunction with Web-based products"; and (3) "whether the parties' marketing channels overlap in any other way." *Therma-Scan*, 295 F.3d at 637 (citation omitted).

Here, both Plastics NYC and Plastics Boutique market their clothing through social media and the Internet.  But "just because the two parties market their products on the Internet does not 'automatically lead to the conclusion that they use common marketing channels.'"  *Progressive Distrib. Servs.*, 856 F.3d at 435 (citation omitted).  And these online channels provide a variety of methods for reaching the market that courts must distinguish.  In that regard, the "real-life circumstances of the market" demonstrate that Plastics NYC does not use the same web-based sites as Plastics Boutique as *substantial* marketing channels.  *Therma-Scan*, 295 F.3d at 637 (citation omitted); *Kibler*, 843 F.3d at 1080.  While Defendants market extensively on Instagram and Facebook, Plaintiff—by its own admission—is restricted from purchasing advertisements on either site.  (ECF No. 49-1, PageID #632–33.)  And Ms. Adams actively grew and cultivated Defendants' original TikTok account to the point where it had over 75 times as many followers as Plaintiff's.  (ECF No. 34, PageID #406–07; ECF No. 19-1, ¶ 18, PageID #236; ECF No. 50-1, PageID #1039.)  Given the different social media presences of the parties, a reasonable jury could not find a likelihood of confusion.

Therefore, any likelihood of confusion in this case will arise not through the channel itself (*how* the products are marketed) but from customers in the market (*to whom* those products are sold).  "Obviously, dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake, or deception."  *Homeowners Grp.*, 931 F.2d at 1110.  Here, the parties have different customer bases.  While Plastics NYC sells clothing to both men

37

and women, Plastics Boutique market exclusively to women.  (ECF No. 50-1, PageID #1011; ECF No. 34, PageID #413, #455, #477 & #482.)  Plastics NYC's offerings are comparatively more expensive and—to paraphrase Mr. Johnson's own words—higher quality.  (ECF No. 28, PageID #333; ECF No. 34, PageID #476 & #481.)  On this score, the Court cannot say that a reasonable jury would not find some risk of confusion.

### I.A.2.e. Likely Degree of Purchaser Care

In assessing the degree of purchaser care, courts use a "typical buyer exercising ordinary caution" standard, where more sophisticated buyers purchasing more expensive products will have a higher standard of care—decreasing the likelihood of confusion. *Daddy's Junky Music Stores*, 109 F.3d at 285; *Homeowners Grp.*, 931 F.2d at 1111.  But a higher degree of care is appropriate "when a buyer has expertise or is otherwise more sophisticated . . . ."  *Homeowners Grp.*, 931 F.2d at 1111.  Likewise, a higher degree of care is appropriate when a consumer makes "an expensive or unusual purchase."  *Therma-Scan, Inc.*, 295 F.3d at 638 (citing *Homeowners Grp.*, 931 F.2d at 1111).  "This expectation of greater attention, where appropriate, diminishes the likelihood of confusion."  *Id.*

The parties dispute the degree of care applicable here.  Plaintiff argues that because "both parties' clothing is inexpensive," ordinary care is appropriate.  (ECF No. 60, PageID #1573–74.)  And because both brands use a "Plastics" mark, Plaintiff contends that an ordinary consumer is likely to confuse the brands.  (*Id.*)  Defendants argue that, because "[t]he purchase of clothing items is a highly personal choice" that is dependent on "customer loyalty" and the awareness of the "latest fashion

38

offerings[,] . . . consumers are unlikely to confuse the respective clothing lines." (ECF No. 51, PageID #1223.)

Courts outside of the Sixth Circuit have determined that clothing purchasers generally exercise a higher degree of care. *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1165 n.4 (9th Cir. 2009); *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987); *Alfwear, Inc. v. Mast-Jägermeister U.S., Inc.*, No. 2:12-cv-00936, 2021 WL 364109, at *7 (D. Utah Feb. 3, 2021); *Kookai, S.A. v. Shabo*, 950 F. Supp. 605, 609 (S.D.N.Y. 1997). Though that might be true in some circumstances, it will not be in all. Indeed, individual purchasers of the same brand can "span the sophistication spectrum." *Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC*, 575 F. Supp. 3d 785, 835 (W.D. Ky. 2021).

Based on Plaintiff's own arguments that it sells higher-quality products at a generally higher price point, the record demonstrates that Plaintiff's customers are "more sophisticated than an average consumer and able to discern the difference between the two brands" and would preclude a finding in Plaintiff's favor by a reasonable jury. (ECF No. 28, PageID #352.)

### I.A.2.f. Likelihood of Expansion

Product confusion likely occurs if a "strong possibility" exists that either party will expand to compete with the other party's market or consumer base. *Homeowners Grp.*, 931 F.2d at 1112 (citing Restatement of Torts § 731(b) & comment c (1938)). The expansion can occur either geographically or through an increase in the variety of products or services. *Id.* However, a determination that either party will not expand is not dispositive for the issue of likelihood of confusion. *Wynn Oil*, 839 F.2d at

39

1189.  Like other factors, the likelihood of expansion factor carries more weight "in instances where the plaintiff has provided evidence in support of the factor, as opposed to instances where no likelihood of expansion is evident."  *Bliss Collection, LLC v. Latham Cos., LLC*, 82 F.4th 499, 514 (6th Cir. 2023) (citing *Daddy's Junky*, 109 F.3d at 287; *Champions Golf Club*, 78 F.3d at 1112).

As Plastics NYC argues, the record shows that Plastics Boutique's product line continues to expand, from a single t-shirt initially to many different items now.  Still, no evidence in the record suggests that it is likely to expand to high-end street wear, men's clothing, or products similar in style, quality, or otherwise to those of Plastics NYC.  In other words, Plaintiff fails to point to evidence of an intent for Plastics Boutique to compete with Plastics NYC and market to their consumers.  *See Homeowners Grp.*, 931 F.2d at 1112.  Unlike *The Ohio State University. v. Thomas*, 738 F. Supp. 2d 743, 755 (S.D. Ohio 2010), where the defendants were "poised to expand the market and distribution channels for their products," the record here contains no such evidence.  Therefore, a rational trier of fact could not find in favor of Plaintiff on this factor.

\*     \*     \*

Balancing these factors to determine whether there is a likelihood of confusion presents a question of law.  *Therma-Scan*, 295 F.3d at 630–31 (citations omitted).  Based on the record in this case, the key factors driving the legal determination whether a likelihood of confusions exists are the strength of the mark, actual confusion, marketing channels, and the likelihood of expansion.  These factors fail to support Plaintiff's claim for the foregoing reasons.  Moreover, construing the record

40

in Plaintiff's favor as the non-movant on Defendants' motion for summary judgment, the other factors either stand relatively in equipoise or have little relevance.  For example, to the extent clothing is generally interchangeable, such that the goods at issue might be related, giving this factor more prominence in the analysis would tend to support weak claims of trademark infringement.  And because of the spectrum of consumer sophistication in the clothing space, "[t]his factor is basically a wash." *Heaven Hill Distilleries*, 575 F. Supp. 3d at 835.  In any event, the factors taken together as a whole favor Defendants.

• • •

Because this analysis constitutes the touchstone of liability in trademark infringement actions, and because the record establishes that Defendants are the senior user of the "Plastics" mark, the Court determines that Defendants are entitled to judgment as a matter of law on Plaintiff's federal trademark infringement claim. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 280.

### I.B.    Unfair Competition

Plaintiff brings a claim for unfair competition under 15 U.S.C. § 1125.  That statute provides that a person "who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which . . . is likely to cause confusion" has liability.  *Id.* § 1125(a)(1)(A).

Under the Lanham Act, the test for unfair competition is the same as the test for likelihood of confusion, examining the likelihood of confusion between the marks.

41

*Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006); *Anheuser-Busch, Inc. v. Florists Ass'n of Greater Cleveland, Inc.*, 603 F. Supp. 35, 38–39 (N.D. Ohio 1984). "[T]he same factors are considered under section 1125(a) as are considered under section 1114." *Champions Gold Club*, 78 F.3d at 1123 (quoting *Wynn Oil*, 943 F.2d at 604). However, a claim for unfair competition does not require that a "defendant use the plaintiff's trademark." *Bird v. Parsons*, 289 F.3d 865, 877 (6th Cir. 2002) (citing *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 626 (6th Cir. 1996)).

Because unfair competition under Section 1125(a) turns on the likelihood of confusion, the same analysis discussed above applies here. Therefore, "no reasonable jury could find a likelihood of confusion" on this record. *Kibler*, 843 F.3d at 1082–83. Defendants are entitled to judgment as a matter of law on Plaintiff's unfair competition claim.

## I.C.  Trademark Dilution

Federal law allows for injunctive relief against a person who, "after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution . . . regardless of the presence or absence of actual or likely confusion." 15 U.S.C. § 1125(c)(1). Dilution differs from trademark infringement in that dilution "only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark" and is not based on likelihood of confusion. *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003). To prevail on a trademark dilution claim, Plaintiff must prove that it has a senior mark that is "(1) famous and (2) distinctive, and that [the junior user's] use of the mark (3) was in commerce, (4) began after [Plaintiff's] mark became famous, and

(5) 'cause[d] dilution of the distinctive quality' of [Plaintiff's] mark." *Audi*, 469 F.3d at 547; *see also AutoZone, Inc v. Tandy Corp.*, 373 F.3d 786, 802 (6th Cir. 2004).

As previously discussed, Defendants used the "Plastics" mark in commerce before Plaintiff and are the senior user of the mark.  "Anti-dilution laws protect a *senior user's* mark," and "the *senior user* must demonstrate that it has a famous mark and that the junior user's conduct damages the *senior's* interest in the mark." *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 424 (6th Cir. 1999) (quoting *Ameritech, Inc. v. American Info. Techs. Corp.*, 811 F.2d 960, 965 (6th Cir. 1987)) (emphasis added).  Because Plaintiff cannot establish that it is the senior user of the mark, the Court need not analyze the remaining elements.  Therefore, Defendants are entitled to judgment as a matter of law on Plaintiff's trademark dilution claim.

### I.D.  Unfair and Deceptive Trade Practices Under the FTCA

Plaintiff's fourth cause of action alleges that Defendants "pass[ed] off its goods as those of Plaintiff" in violation of Section 5 of the Federal Trade Commission Act. (ECF No. 1, ¶ 53, PageID #14.)  Under Section 5 of the Act, the FTC is "empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(2).  To prevail on such claims, the FTC must demonstrate that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material."  *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630–31 (6th Cir. 2014) (citation omitted).

43

Because Plaintiff is not the FTC, it cannot bring this claim.  The Sixth Circuit has determined that "no private cause of action exists under the FTCA." *Sharwell v. Selva*, 4 F. App'x 226, 227 (6th Cir. 2001); *see also Wright v. Richardson*, 740 F. Supp. 3d 601, 616–17 (E.D. Mich. 2024) (determining that the private plaintiff "ha[d] no standing to bring [a] claim under 15 U.S.C. § 45").  Moreover, "Congress has clearly limited the invocation of jurisdiction under the FTC Act to the Commission itself." *Federal Trade Comm'n v. Owens-Corning Fiberglas Corp.*, 853 F.2d 458, 464 (6th Cir. 1988) (citation omitted).  The plain language of the statute is clear:  "15 U.S.C. § 45 frequently references the 'Commission' and its ability to bring claims under the statute . . . [i]t never refers to anyone besides the 'Commission' having power to bring claims." *Wilson v. Bank of America*, N.A., No. 3:22-cv-00317, 2023 WL 1930007, at *2 (M.D. Tenn. Feb. 10, 2023).  Plaintiff concedes as much.  (ECF No. 57, PageID #1542.)  Therefore, Plaintiff's claim under the Federal Trade Commission Act fails, and Defendants are entitled to judgment as a matter of law on this claim.

Construing Plaintiff's claim under State law fares no better.  Ohio's Deceptive Trade Practices Act requires an analysis that "is the same as for an unfair competition claim under the Lanham Act—likelihood of consumer confusion." *Profusion Indus., LLC v. Chem-Tek Sys., Inc.*, No. 5:16-cv-164, 2016 WL 7178731, at *3 (N.D. Ohio Dec. 9, 2016) (citing *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 880–81 (S.D. Ohio 2007)).  Because the Court has determined that there is no likelihood of confusion as a matter of law, Defendants are entitled to judgment as a

44

matter of law on Plaintiff's unfair and deceptive trade practices claim under State law as well.

### I.E.    Ohio Trademark Infringement and Unfair Competition

Plaintiff's final claims involve common-law trademark infringement and unfair competition. (ECF No. 1, ¶¶ 56–60, PageID #14–15.)  Ohio law on these claims follows the same analysis as federal law.  *ETW Corp. v. Jireh Publ'g, Inc.,* 332 F.3d 915, 920 (6th Cir. 2003) ("Because trademark claims under Ohio law follow the same analysis as those under the Lanham Act, our discussion of the federal trademark claims will therefore encompass the state trademark claims as well."); *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 629, 626 n.2 (6th Cir. 2002) ("Both Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act."); *see also Future Lawn, Inc. v. Maumee Bay Landscape Contractors, L.L.C.,* 542 F. Supp. 2d 769, 780 (N.D. Ohio 2008).

"Because the Court has already determined that Plaintiff's [federal trademark infringement] claim is to be dismissed, the same reasoning applies to Plaintiff's claims of unfair competition . . . under Ohio common law." *Bodine Perry*, 667 F. Supp. 3d at 634.  Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiff's common-law claims.

## II.     Defendants' Counterclaims

### II.A.  Declaratory Judgment

Defendants seek a declaratory judgment that "Plaintiff's trademark is invalid and unenforceable or in the alternative that Plastic[s] Boutique's use of 'Plastics' or 'The Plastics' does not constitute infringement."  (ECF No. 15, ¶ 38, PageID #192.)

Pursuant to 28 U.S.C. § 2201, "in 'a case of actual controversy within its jurisdiction' a federal court 'may' give a declaratory judgment, a power permissive, not mandatory."  *Grand Trunk W. R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 325 (6th Cir. 1984).  "[I]t is well settled that the granting of a declaratory judgment rests in the 'sound discretion' of the court."  *Id.* (citing C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2759 at 645 (1983)).

A declaratory judgment results in the entry of a judgment and all that goes with it.  "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C. § 2201(a).  "[I]n a case of actual controversy within its jurisdiction," except for certain circumstances not relevant here, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  *Id.*; *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 142 (1967).  "A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them . . . ."  Restatement (Second) of Judgments § 33 (1982).

Because the Court has already determined that Defendants are entitled to judgment as a matter of law on Plaintiff's federal trademark infringement claim, it

follows that it may enter a declaratory judgment that "Plastic[s] Boutique's use of 'Plastics' or 'The Plastics' does not constitute infringement."  (ECF No. 15, ¶ 38, PageID #192.)

### II.B.  Tortious Interference with a Business Relationship

Defendants move for summary judgment on their second counterclaim, tortious interference with a business relationship.  "Under Ohio law, a cause of action for [tortious interference with business relations] is made out when '. . . one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another . . . .'"  *Franklin Tractor Sales v. New Holland N. Am., Inc.*, 106 F. App'x 342, 344 (6th Cir. 2004) (quoting *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1138 (6th Cir. 1995)).  To prevail on this claim, Defendants must establish:  "(1) the existence or the prospect of a business relationship; (2) that [Plaintiff] knew of the [Defendants'] relationship; (3) that [Plaintiff] intentionally and materially interfered with the [Defendants'] prospective relationship; (4) the interference was without justification; and (5) the interference causes [Defendants] to suffer damages."  *Bodine Perry*, 667 F. Supp. 3d at 635 (citation omitted).

The undisputed evidence in the record shows that Defendants marketed their business through TikTok and Instagram.  (*See, e.g.*, ECF No. 34, PageID #404–05.) Plastics Boutique in part relied on social media influencers to market its products on these platforms.  (ECF No. 19-1, ¶ 13, PageID #235; ECF No. 34, PageID #410–12; ECF No. 50-1, PageID #1070.)  Further, the record shows that Mr. Johnson reported many of Plastics Boutique's posts on Instagram and TikTok for trademark

infringement.  (ECF No. 19-1, ¶ 21, PageID #236; ECF No. 49-1, PageID #685; ECF No. 50-1, PageID #1039–40.)   At her deposition, Ms. Adams testified that she "agree[d] to [Instagram's and TikTok's] terms and conditions."  (ECF No. 50-1, PageID #1063.)  Also, she stated that neither she nor Plastics Boutique had any other contractual relationship with these social media sites.  (*Id.*, PageID #1031–33, #1061–64 & #1074–75.)

Although the record supports several of the elements of this cause of action, two questions preclude the entry of summary judgment for or against either party on this claim.  First, Defendants used influencers and posts on TikTok and Instagram to drive customers to purchase items through Plastics Boutique's online store.  (ECF No. 51-1, PageID #1010–11, #1014–15, #1045–46 & #1070; ECF No. 19-1, ¶ 13, PageID #235; ECF No. 34, PageID #410–12.)   It is not clear whether this type of relationship with social media platforms can support a claim for tortious interference, factually or legally.  The parties did not address this issue in their briefs, and the Court's research failed to locate any authority from Ohio courts directly on point. Indeed, Ohio courts have expressed "concern over the lack of developing law governing the relationship social media companies have with their users and the general public" in other contexts.  *Godwin v. Facebook, Inc.*, 2020-Ohio-4834, 160 N.E.3d 372, ¶ 39 (Ohio Ct. App.) (Blackmon, J., concurring).

Second, Plaintiff maintains that Mr. Johnson had a privilege to protect his intellectual property rights by contacting TikTok and Instagram and taking down

48

Defendants' accounts.  Under Ohio law, a claim for tortious interference does not lie against a person who acts in good faith to protect a legally protected interest:

> One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App. 3d 440, 2009-Ohio-36, 905 N.E.2d 1246, ¶ 62 (2009); *see also Wagner-Smith Co. v. Ruscilli Constr. Co., Inc.*, 2006-Ohio-5463, 861 N.E.2d 612, ¶ 15.  On this issue, the record reflects the parties' genuine dispute of material fact that a jury must resolve.  On the one hand, Mr. Johnson maintains that he had a good-faith belief that he was acting to protect his trademark.  On the other hand, Defendants insist that he acted in bad faith to cause harm to Ms. Adams and Plastics Boutique.  On this record, assuming Ohio law permits a claim for tortious interference based on efforts to take down a person's social media accounts, liability turns on an evaluation of Mr. Johnson's intent on the facts presented, and a jury could find in favor of either party depending on its evaluation of the evidence, including Mr. Johnson's credibility.

For these reasons, neither party is entitled to summary judgment on this claim.  The Court will order supplemental briefing on the legal question whether Ohio law permits a claim for tortious interference with a business relationship based on efforts to take down a person's social media accounts.

## II.C.  Unfair Competition

Defendants base their counterclaim for unfair competition on Plaintiff's efforts to remove Plastic Boutique's social media presence.  (ECF No. 15, ¶¶ 52–59, PageID

#194–95.)  But it is not clear whether they plead this claim under federal or State law.  (*Id.*)  In their papers, the parties argue the claim under both federal and State law.  (*See* ECF No. 51, PageID #1230; ECF No. 56, PageID # 1527–28; ECF No. 57, PageID #57; ECF No. 60, PageID #1581.)

### II.C.1. Federal Law

Under federal law, Defendants point to a case that such a claim requires:  (1) a false or misleading statement of fact concerning a product; (2) which tends to deceive a substantial portion of the intended audience; (3) and which must be material in that it will likely influence a deceived consumer's purchasing decisions; (4) introduced into interstate commerce; and (5) causation.  *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 323 (6th Cir. 2001) (citing *American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999)).  Under federal law, a claim for damages under the Lanham Act based on deceptive or ambiguous advertising requires "proof of actual deception (*i.e.*, evidence that individual consumers perceived the advertising in a way that misled them about the plaintiff's product)."  *Id.* (citing *American Council of Certified Podiatric Physicians & Surgeons*, 185 F.3d at 613).  Further, it must be demonstrated that a "'significant portion' of the consumer population was deceived."  *Id.* (citing *American Council of Certified Podiatric Physicians & Surgeons*, 185 F.3d at 614).

Against this standard, Defendants point to no evidence in the record of consumer deception.  Instead, Defendants generally argue that Mr. Johnson's reports to TikTok and Instagram resulted in harm to Plastics Boutique.  (ECF No. 51, PageID #1230–31; ECF No. 56, PageID #1527–28.)  But the argument is largely conclusory

50

and presented without sufficient factual citation to the record.  Therefore, the Court finds that Defendants have failed to carry their burden of establishing entitlement to a judgment in their favor on this claim.

For its part, Plaintiff argues for summary judgment on this claim by arguing Mr. Johnson's good faith and the limited impact on Plastics Boutique of their deplatforming.  (ECF No. 60, PageID #1581–82.)  Based on the parties' papers, it is not clear that these facts are relevant to a determination on the applicable legal standard identified in the briefing.  If they are, the parties have a genuine dispute of material fact that requires resolution by a jury.  If they are not, then Plaintiff fails to carry its burden of establishing that it is entitled to judgment as a matter of law on this claim.

### II.C.2. Ohio Law

Regarding Ohio law, Defendants argue that common-law claims for unfair competition extend more broadly to other types of unfair commercial practices.  (ECF No. 56, PageID #1527.)  In support, Defendants rely on two cases: *Landskroner v. Landskroner*, 154 Ohio App. 3d 471, 2003-Ohio-5077, 797 N.E.2d 1002, and *Microsoft Corporation v. Action Software*, 136 F. Supp. 2d 735 (N.D. Ohio 2001).  In the former, the court recognized that unfair competition claims may extend to "unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Landskroner*, 2003-Ohio-5077, ¶ 52 (citing *Henry Gehring Co. v. McCue*, 23 Ohio App. 281, 283 (1926)).  In the latter, the court noted that "unfair competition . . . may consist of unethical business practices not necessarily amounting to the passing off of goods or services." *Microsoft*,

51

136 F. Supp. 2d at 740 (citing Trademarks, Tradenames and Unfair Competition, 88 OH Jur. 3d Trade Regulation § 66 (1989)).  "Under Ohio common law, unfair competition 'consists of representations by one person, for the purpose of deceiving the public, that his goods are those of another." *TSDC, LLC v. Curtis Pearson*, No. 1:24-cv-00370, 2025 WL 2459244, at *4 (N.D. Ohio Aug. 26, 2025) (quoting *Water Mgmt., Inc. v. Stayanchi*, 15 Ohio St. 3d 83, 85, 472 N.E. 2d 715, 717 (1984)).

Again, the parties frame their arguments around Mr. Johnson's reports of Defendants' social media posts, which Plaintiff characterizes as efforts to protect Mr. Johnson's intellectual property rights.  (ECF No. 56, PageID #1527–29; ECF No. 57, PageID #1543–44.)  Again, it is not clear that these arguments meet the legal standards for the claim or that the parties sufficiently developed a record to support their respective motions for summary judgment.  But unfair competition "has come to develop a broader connotation in recent years." *Key Realty, Ltd. v. Hall*, 2021-Ohio-1868, 173 N.E.3d 831, ¶ 72 (Ohio Ct. App.) (citation omitted).

Moreover, "Ohio does not have a significant amount of case law relating to [Ohio's Deceptive Trade Practices Act].  As a result, 'where claims are made under Ohio common law and the deceptive trade practices statutes, courts are to apply essentially the same analysis as that applied in assessing unfair competition under the federal statutes." *Heartland of Urbana OH, L.L.C. v. McHugh Fuller L. Grp., P.L.L.C.*, 2016-Ohio-6959, 72 N.E.3d 23, ¶ 50 (Ohio Ct. App.) (citation omitted).  Therefore, the Court cannot conclude that the record permits entry of judgment as a matter of law on this claim for either party.

### III.  Angel Adams Liability Defense

Because the Court determined that Plastics Boutique is not liable for the claims against it, Angel Adams is not personally liable.  Courts have consistently recognized that "an individual can be jointly liable for a company's infringing conduct." *Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 478 (7th Cir. 2007) (citations omitted).  However, an individual "must do more than merely control corporate affairs . . . [she] must personally take part in the infringing activity or direct others to do so in order to be liable." *GS Holistic, LLC v. Express Smoketown, Inc.*, No. 3:23-cv-02040, 2024 WL 3228392, at *3 (N.D. Ohio June 28, 2024) (citation omitted).  An individual would have liability as an actor, not as the owner or agent of the corporation.  *Id.*

Plaintiff cites *Polo Fashions, Inc. v. Ontario Printers, Inc.*, 601 F. Supp. 402, 403 (N.D. Ohio 1984), to argue that "a responsible businessperson cannot avoid personal responsibility and liability for infringing on a trademark by contending that only the corporation is liable."  (ECF No. 60, PageID #1586; ECF No. 57, PageID #1544.)  But *Polo Fashions* supports an argument that Defendants do not make.  601 F. Supp. at 403.  Ms. Adams has not attempted to shield herself from personal liability by hiding behind corporate formalities.

In any event, the Court determined that Plaintiff's claims fail as a matter of law.  By extension, Angel Adams cannot be personally liable for Plastics Boutique's alleged infringement, and she is entitled to judgment in her favor on the issue of personal liability.

## CONCLUSION

For all these reasons, the Court **DENIES** Defendants' motions to strike (ECF No. 58; ECF No. 61); **GRANTS** Defendants' motion for summary judgment on Plaintiff's claims against it and **DENIES** Plaintiff's motion for summary judgment in its favor on its claims; **DENIES** Plaintiff's motion for summary judgment in its favor on Defendants' counterclaims; and **GRANTS IN PART AND DENIES IN PART** Defendants' motion for summary judgment on their counterclaims.

The Court **ORDERS** supplemental briefing on the legal question whether, on the facts and circumstances of this case, Ohio law recognizes a claim for tortious interference with a business relationship based on efforts to take down, in whole or in part, a business's social media presence.  By separate order, the Court will refer this matter to the Magistrate Judge to set a briefing schedule after conferring with counsel for the parties.

**SO ORDERED.**

Dated:  September 22, 2025

J. Philip Calabrese
United States District Judge
Northern District of Ohio